185 F.3d 579 (6th Cir. 1999)
 BETTY INGRAM, RAY WOMACK, DEBORAH WOMACK, AND PATRICIA COLLINS, PLAINTIFFS-APPELLANTS,
v.
CITY OF COLUMBUS, OFFICER E. MORE, OFFICER WINDON, OFFICER S. LAZAR, OFFICER R. DUNLAP, OFFICER D. PULVERMACHER, AND OFFICER JOHN DOE, INDIVIDUALLY AND AS POLICE OFFICERS FOR THE CITY OF COLUMBUS, DEFENDANTS-APPELLEES.
 No. 97-4303
 U.S. Court of Appeals, Sixth Circuit
 Submitted: January 28, 1999
Decided and Filed: July 19, 1999
 
 Appeal from the United States District Court for the Southern District of Ohio at Columbus. No. 95-00910--George C. Smith, District Judge.[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 Zach Zunshine (briefed), Columbus, OH, for Plaintiffs-Appellants.
 Glenn B. Redick (briefed), Diane M. Meftah (briefed), Columbus City Attorney's Office, Columbus, OH, for Defendant-Appellee.
 Before: Kennedy, Daughtrey, and Clay, Circuit Judges.
 CLAY, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. KENNEDY, J. (pp. 598-602), delivered a separate opinion Concurring in part and Dissenting in part.
 OPINION
 Clay, Circuit Judge.
 
 
 1
 Plaintiffs Betty Ingram, Ray Womack, Deborah Womack and Patricia Collins appeal the judgment of the district court entered on October 15, 1997, granting the motion for summary judgment of Defendants City of Columbus and individual officers of the Columbus Police Department, in this case arising under Ohio law and 42 U.S.C. § 1983 (1994) and alleging numerous common law and Fourth Amendment violations. For the reasons set forth below, we REVERSE the judgment of the district court.
 
 I.
 
 2
 On September 21, 1994, several police officers employed by Columbus, Ohio were working as members of the SCAT Team South, a city street crime attack unit, in response to citizen complaints to the Columbus police department about illegal drug activity in the area between Morrison and Stoddart Avenues in Columbus. The officers planned to conduct a narcotics "buy-bust"[1] in the first alley north of Main Street in Columbus. Sergeant Ronald Dunlap drove an unmarked city vehicle through the area while one or two officers dressed in SCAT uniforms observed Sgt. Dunlap's activities from concealed positions in the immediate vicinity. Arrest officers dressed in plain clothes were also patrolling the area at the time.
 
 
 3
 As the SCAT team watched, an individual named Anthony Carroll approached Sgt. Dunlap's car and offered to sell Sgt. Dunlap one unit dose of crack cocaine. Carroll got into Sgt. Dunlap's car and directed Sgt. Dunlap to drive and park on Rich Street, just west of Berkeley. Sgt. Dunlap gave Carroll two city-issued $10 bills with pre-recorded serial numbers. Carroll walked to a residence on Berkeley just north of Rich Street, and then walked south on Berkeley for a short distance, during which time he was out of Sgt. Dunlap's view. A few minutes later, Carroll returned to the vehicle and told Sgt. Dunlap that some unknown persons had taken the money from him without giving him the drugs in return. When Carroll said he was leaving, Sgt. Dunlap told him he was under arrest for offering to sell cocaine. Upon hearing that he was under arrest, Carroll fled on foot, running to the north through private yards and to the east across Berkeley. Sgt. Dunlap and three officers pursued Carroll on foot, while other officers followed Carroll in their vehicles. Carroll rushed into Plaintiffs' residence at 395 Stoddart Avenue, ran into the basement, and crawled under a bed.[2]
 
 
 4
 A number of armed officers followed Carroll into 395 Stoddart through the front door, which was not locked at the time, without first knocking. The officers who entered were in plain clothes but did not identify themselves as officers and did not announce their purpose. By entering through the front door, the officers entered first into the living room, where they encountered Betty Ingram, a fifty-three year old diabetic, her daughter Leona Womack, and Leona Womack's two-year old son Tim and five-year old daughter Tanisha.[3] When the officers entered, Betty Ingram and the children were napping, while Leona Womack was watching television. Additionally, at the time the officers entered, Betty Ingram's son, Ray Womack, was napping in the basement, and her daughters Patricia Collins and Deborah Womack, who is hearing and speech impaired, were upstairs. Betty Ingram and Leona Womack did not attempt to resist the officers' entry into their home.[4]
 
 
 5
 The officers found Ray Womack in the basement, awakened and handcuffed him, and brought him up to the living room. They placed Ray Womack face down on the floor, and had their guns drawn and pointed at him. Betty Ingram asked the officers to let Ray Womack go, explained that he had done nothing wrong and asked them not to kill her son. Patricia Collins, who had come downstairs, asked the officers what was going on. Using expletives, the officers told the women to shut up. Deborah Womack also came downstairs into the living room. These women did not interfere with the officers. One of the officers hit Betty Ingram in the face, knocking her down. Betty Ingram called for the assistance of her neighbor, Mrs. Davis.
 
 
 6
 At some point, the officers realized that Ray Womack was not the suspect they had chased. They searched the house again, found Carroll hiding in the basement, and arrested him. When the officers brought Carroll up from the basement, they uncuffed Ray Womack, and instead handcuffed Betty Ingram and Deborah Womack. When Patricia Collins asked why the officers were taking Betty Ingram to jail, the officers again, using expletives, told her to shut up. One of the officers hit Patricia Collins in the head. The officers also arrested Patricia Collins. As Betty Ingram sat on her couch in handcuffs, one of the officers shook her violently and banged her head against the couch.
 
 
 7
 The officers proceeded to remove Carroll from 395 Stoddart without any interference from Plaintiffs or Leona Womack.[5] The officers did not file charges against Ray and Deborah Womack. The officers took Betty Ingram and Patricia Collins to the police station, and charged them with obstructing official business. The two spent approximately twelve hours in jail before the police released them on bond. Upon their release, Ingram and Collins visited the Emergency Room at the Park Medical Center in Columbus, where they were diagnosed as having contusion of the scalp and minor contusion of the scalp, respectively. Charges against the two women were eventually terminated by way of bond forfeiture of $100 each.
 
 
 8
 Plaintiffs filed suit against the City of Columbus and several of its police officersin the district court on September 15, 1995, alleging violations of their Fourth Amendment rights and seeking relief under 42 U.S.C. § 1983. Defendants moved for summary judgment on January 28, 1997. The district court issued an Opinion and Order granting Defendants' motion for summary judgment and entered judgment in favor of Defendants on October 15, 1997. Plaintiffs filed timely notice of appeal to this Court on November 8, 1997.
 
 II.
 
 9
 This Court reviews de novo a district court's order granting summary judgment. See Smith v. Ameritech, 129 F.3d 857, 863 (6th Cir. 1997). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. In reviewing the record, we are to believe the evidence of the non-movant, and draw all justifiable inferences in favor of the non-movant. See Russo v. City of Cincinnati, 953 F.2d 1036, 1041-42 (6th Cir. 1992). Accordingly, on summary judgment, neither the district court nor this Court may make credibility determinations or weigh the evidence. See Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986). If the record taken as a whole may lead a rational trier of fact to find for the non-movant, summary judgment is inappropriate. See Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
 
 
 10
 In their complaint, Plaintiffs alleged that the individual Defendants committed numerous violations of the Fourth Amendment entitling them to relief under § 1983. Plaintiffs also raised state law claims of malicious prosecution, false imprisonment, and false arrest, and for humiliation, indignity, and severe emotional distress. Plaintiffs further alleged in their complaint that the City of Columbus engaged in a pattern and practice of failing to investigate instances of police misconduct and of failing to properly supervise, train and discipline its police officers. On appeal, Plaintiffs argue only that (1) Defendants entered their home in violation of the Fourth Amendment; (2) Defendants violated their Fourth Amendment rights by seizing them without probable cause; (3) Defendants violated their Fourth Amendment rights by using excessive force in effectuating those seizures; and (4) Defendants caused them to suffer humiliation; indignity and severe emotional distress. While Defendants claimed qualified immunity below, the district court did not address it, and therefore Defendants' claim of qualified immunity is not before us on appeal. Moreover, on appeal, Plaintiffs do not challenge the district court's dismissal of their § 1983 claim against the Columbus Police Department, or of their other state law claims. We therefore do not address Defendants' claim of qualified immunity, Plaintiffs' § 1983 claim of municipal liability, or Plaintiffs' state law claims of false imprisonment, malicious prosecution, and false arrest, see, e.g., Kallstrom v. City of Columbus, 136 F.3d 1055, 1069 n.6 (6th Cir. 1998), and turn instead to the constitutional and state law claims that remain before this Court.
 
 A. Unreasonable Entry
 
 11
 The Fourth Amendment, which applies to the states through incorporation by the Fourteenth Amendment, protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As the Supreme Court has observed, the zone of privacy protected by the Fourth Amendment is most clearly defined "when bounded by the unambiguous physical dimensions of an individual's home." Payton v. New York, 445 U.S. 573, 589 (1980). Indeed, the Fourth Amendment "has drawn a firm lineat the entrance to the house," a threshold which police officers generally may not cross without a warrant. Id. at 590. Moreover, in some circumstances, the Fourth Amendment deems unreasonable and thus unconstitutional an officer's unannounced entry into a dwelling. See Wilson v. Arkansas, 514 U.S. 927, 934 (1995). In claiming that Defendants' entry into their house was "unreasonable" and deprived them of their Fourth Amendment rights, Plaintiffs point to Defendants' failure to first obtain a warrant as well as Defendants' failure to first knock and announce their entry.
 
 1. Failure to Obtain Warrant
 
 12
 Under the Fourth Amendment, absent exigent circumstances, police officers may not make a warrantless and nonconsensual entry into a private dwelling to make a routine felony arrest. See Payton, 445 U.S. at 576, 590. This Court has traditionally found the presence of "exigent circumstances" excusing the warrant requirement for entry into a home where (1) the officers involved were in hot pursuit of a fleeing suspect; (2) the suspect posed an immediate threat to arresting officers or to the public; and (3) immediate police action was necessary to prevent the destruction of vital evidence or to prevent the escape of a known criminal. See Jones v. Lewis, 874 F.2d 1125, 1130 (6th Cir. 1989). We have further observed that "in a civil damage suit, whether exigent circumstances existed to excuse a warrantless arrest is a question for the jury provided that, given the evidence on the matter, there is room for a difference of opinion." O'Brien v. City of Grand Rapids, 23 F.3d 990, 998 (6th Cir. 1994).
 
 
 13
 In the present case, the officers were pursuing a fleeing suspect at the time that they entered 395 Stoddart. Plaintiffs do not dispute this fact. Instead they argue that the "exigent circumstances" inquiry must involve a balancing of interests, and that because Carroll's offense was minor, the government's interest in apprehending him was minimal. Indeed, "because the government's interest is necessarily less compelling in cases involving minor offenses, the gravity of the underlying offense is 'an important factor to be considered when determining whether any exigency exists.'" United States v. Rohrig, 98 F.3d 1506, 1517 (6th Cir. 1996) (quoting Welsh v. Wisconsin, 466 U.S. 740, 750-53 (1984)). Under Welsh, courts must look to the state's penalty scheme to determine the seriousness of a state law offense; if the suspect has committed an offense "for which no imprisonment is possible," the offense is "minor." See Welsh, 466 U.S. at 754.
 
 
 14
 Plaintiffs assert that Carroll committed a minor offense in that he did no more than rob a police officer of twenty dollars. Under Ohio law, attempting drug trafficking can constitute a misdemeanor of the first degree. See Ohio Rev. Code Ann. §§ 2923.02, 2925.03 (Banks-Baldwin 1995); State v. Cola, 603 N.E.2d 405 (Ohio Ct. App. 1992); In re Carver, 698 N.E.2d 151, 153 (Ohio Ct. Cl. 1997). However, under Ohio law, the government may convict one who offers to sell a controlled substance for aggravated drug trafficking, a felony offense which carries a presumption for a term of imprisonment. See Ohio Rev. Code Ann. § 2925.03 (Banks-Baldwin 1995).
 
 
 15
 Given the facts of this case, we conclude that when the officers set out to pursue Carroll, they had probable cause to believe that he had offered to sell crack cocaine and had thereby committed a drug offense constituting a felony. Carroll offered to sell crack to Sgt. Dunlap and then disappeared for a while before returning. Moreover, Carroll fled when confronted by Sgt. Dunlap. That a suspect engages in a sequence of events typical of a drug transaction and that he flees after being confronted by police are factors relevant to a "totality of the circumstances" review ofwhether the police had probable cause to believe a drug trafficking offense has taken place. See United States v. Hughes, 898 F.2d 63, 64 (6th Cir. 1990). Because these facts gave rise to probable cause on the part of Defendant officers to believe that Carroll had engaged in a felony warranting imprisonment, their interest in pursuing Carroll was strong. See Welsh, 466 U.S. at 754. Accordingly, we reject Plaintiffs' argument that the officers had cause to believe that the offense committed by Carroll was only a "minor" one and conclude that the district court did not err in holding, as a matter of law, that "exigent circumstances" justified the officers' warrantless entry into Plaintiffs' home.
 
 2. Failure to Knock and Announce
 
 16
 The Supreme Court has held that "the method of an officer's entry into a dwelling [is] among the factors to be considered in assessing the reasonableness of a search or a seizure." Wilson, 514 U.S. at 934. Under the Fourth Amendment, officers must knock and announce their presence and authority before entering a private residence. Id. at 929; United States v. Francis, 646 F.2d 251 (6th Cir.), cert. denied, 454 U.S. 1082 (1981). In some cases, officers may satisfy the knock and announce requirement by identifying themselves as police, even where they do not give their purpose in demanding entry. See United States v. Finch, 998 F.2d 349, 354 (6th Cir. 1993). Although particular "exigent circumstances" may excuse the warrant requirement, "exigent circumstances" for purposes of knock and announce analysis are somewhat different than those applied in warrant exception analysis. See, e.g., United States v. Bates, 84 F.3d 790, 795 (6th Cir. 1996). In order to justify an unannounced entry into an individual's home, the police must reasonably suspect that, under the circumstances, knocking and announcing their presence would (1) be dangerous or futile, or (2) inhibit effective investigation of the crime. See Richards v. Wisconsin, 520 U.S. 385, 394 (1997). Thus, while a certain set of circumstances may excuse the warrant requirement, the law allows for the possibility that those same circumstances might not excuse the knock and announce requirement and requires courts to conduct an independent, case-by-case analysis to determine whether noncompliance with the knock and announce rule is excusable[6]. See id.
 
 
 17
 Plaintiffs assert that Defendants in fact did not knock and announce their presence and did not identify themselves as officers, and Defendants do not deny this assertion. Defendants have not articulated reasons why knocking and announcing or identifying themselves would have been dangerous or futile; nor does the record before this Court disclose facts giving rise to a reasonable belief that Carroll was armed and dangerous or that he had a criminal record reflecting violent tendencies[7]. See Bates, 84 F.3d at 795. Instead,Defendants offer as justification for their actions in entering Plaintiffs' home that (1) they suspected Carroll had engaged in drug trafficking, and (2) they were in "hot pursuit" of Carroll.
 
 
 18
 The mere fact that Defendants believed Carroll had engaged in a drug transaction did not excuse the knock and announce requirement. See Richards, 520 U.S. at 394. The Supreme Court has rejected the notion of a "blanket exception to the knock-and-announce requirement for felony drug investigations," holding that "in each case it is the duty of a court confronted with the question to determine whether the facts and circumstances of the particular entry justified dispensing with the 'knock-and-announce' requirement." Id. Accordingly, "the mere possibility or suspicion that a party is likely to dispose of evidence... is not sufficient to create an exigency" for purposes of the knock-and-announce requirement. See Bates, 84 F.3d at 796. In the present case, Defendants do not even argue that they wished to prevent Carroll from destroying evidence, much less identify a specific concern that he actually possessed drugs that he could easily destroy. Indeed, Defendants never witnessed Carroll possess illegal drugs.
 
 
 19
 Similarly, the fact that Defendants were in "hot pursuit" of Carroll does not, without further justification, prove that knocking and announcing would have been dangerous or futile, or would have prevented effective investigation of the crime.[8] Moreover, we decline Defendants' implicit invitation to ignore these clearly delineated exceptions to the knock and announce rule and to adopt the "hot pursuit" justification as a per se exception to the knock and announce requirement[9]. Our faithfulapplication of knock and announce principles discloses that Defendants had no reason to believe Carroll was dangerous, and that Defendants do not assert that they believed Carroll would destroy evidence or escape, or that they believed announcing their presence or identifying themselves would be futile. Even if the concern that a suspect might escape counts as inhibiting the "effective investigation of the crime," Richards requires a lower court, before excusing the knock and announce requirement, to find that the officers had a reasonable suspicion that announcing their presence would have allowed their suspect to escape. See 520 U.S. at 394. Although "this showing is not high,... the police should be required to make it whenever the reasonableness of a no-knock entry is challenged." Id. at 394-95. Here, Defendants have failed to explain whether they had a reasonable suspicion that announcing their presence and entry into 395 Stoddart would have allowed Carroll to escape out another side of the home.
 
 
 20
 Finally, knocking and announcing in this case would not have been mere "senseless ceremony," see Wilson, 514 U.S. at 936, excusing the requirement[10]. While Defendants may have had reason to believe that Carroll was expecting their arrival, the knock and announce rule addresses the interests of all inhabitants of a private dwelling, innocent citizens and criminal suspects alike. See Finch, 998 F.2d at 353 (describing the right as one belonging to the "occupants of private residences"). As "[t]he possibility is very real that the police may be misinformed as to the name or address of a suspect, or as to other material information" and "[i]nnocent citizens should not suffer the shock, fright or embarrassment attendant upon an unannounced police intrusion," courts should hesitate to approve unannounced police entries into private residences. Ker, 374 U.S. at 57 (Brennan, J., Concurring). Moreover, courts should carefully scrutinize the justification that the occupants of a home were aware of police pursuit; caution in assuming that the parties within a home are aware of the officers' presence and purpose serves to protect officers themselves from property owners who might otherwise mistake them for unlawful trespassers. See id. In this case, where no other justification for an unannounced entry exists and where Defendants did not know whether the home they entered was only the home of the suspect they pursued or had no reason to believe the occupants of 395 Stoddart were prepared for Defendants' entrance or were aware of their presence, we believe knocking and announcing would have been more than a superfluous act[11]. Cf. Ker, 374 U.S. at 60(Brennan, J., Concurring). If Defendants had taken only a few seconds to properly announce themselves, for example, they might have obtained Plaintiffs' cooperation and might have arrested their suspect instead of an innocent man.
 
 
 21
 While we recognize that officers who are in "hot pursuit" may demonstrate exigent circumstances that excuse the knock and announce requirement, we conclude that, under the unique circumstances of this particular case, Defendants have failed to show facts excusing their failure to knock and announce their entry into Plaintiffs' home.[12] By incorrectly presuming that "hot pursuit" provides a per se exception to the knock and announce rule, the district court failed to determine whether the officers had a reasonable suspicion that announcing their presence would have been dangerous or futile or would have inhibited the effectiveness of their investigation, see Richards, 520 U.S. at 394, and erroneously dismissed Plaintiffs' claims that Defendants' entry into their home violated the Fourth Amendment. Since the district court applied the incorrect legal standard to this case, we observe that Defendants may raise the issue again on remand after further development of the facts, and that the district court may then conduct a proper inquiry on the issue of whether Defendants reasonably believed, under the Richards analysis set forth in this opinion, that it would be dangerous or futile to knock and announce before entering 395 Stoddart.
 
 B. Unlawful Seizure
 
 22
 The Fourth Amendment, which applies to the states through incorporation by the Fourteenth Amendment, protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "seizure" of an individual takes place when "by means of physical force or a show of authority, his freedom of movement is restrained." United States v. Mendenhall, 446 U.S. 544, 553 (1980). Probable cause must support an official seizure of the person, even where the officer does not make a formal arrest. See Dunaway v. New York, 442 U.S. 200, 207 (1979). However, certain temporary seizures are justified if the officers have a reasonable articulable suspicion that the detainee is or has engaged in criminal activity. See United States v. Critton, 43 F.3d 1089, 1094 (6th Cir. 1995).
 
 
 23
 1. General Right to Detain Without Reasonable Suspicion or Probable Cause
 
 
 24
 Defendants contend that they required neither reasonable suspicion nor probable cause to handcuff and detain Plaintiffs with the use of firearms. Specifically, Defendants argue that "[u]nder the circumstances of the present case, it was reasonable for Appellee officers to handcuff the Appellants and otherwise secure the area until the fleeing suspect could be detained." (Appellees' Br. at 12.) The handcuffing and detention of Plaintiffs with the display of firearms certainly deprived Plaintiffs of their freedom of action in a significant way, and thus constituted a seizure. See United States v. Knox, 839 F.2d 285, 289 (6th Cir. 1988). While we have occasionally permitted the use of such tactics by officers to detain private individuals for investigative purposes, we havedone so only where the officers making the seizures acted out of a justifiable fear of personal safety. See United States v. Hardnett, 804 F.2d 353, 356 (6th Cir. 1986); see also United States v. Fountain, 2 F.3d 656, 663 (6th Cir. 1993) (permitting detention by handcuffing of occupants of home in which officers had seized weapons and narcotics just one month earlier).
 
 
 25
 Here, there is no evidence to suggest that Defendants had reason to fear for their personal safety. In the events preceding Defendants' entry into 395 Stoddart, Carroll had not displayed a weapon, and the officers possessed no independent information leading them to believe that Carroll was a dangerous individual. Nor does the record disclose behavior on the part of Plaintiffs leading Defendants to justifiably fear for their safety, or any reason for Defendants to believe that 395 Stoddart contained weapons that might be used against them. Most importantly, however, the record suggests that Defendants placed Ingram, Collins, and Deborah Womack in handcuffs after they had already located and handcuffed Carroll and presumably no longer needed to "secure" the area as they searched for their suspect. Setting these points aside, however, we observe that although they themselves can cite no precedent giving rise to such police authority, Defendants ostensibly rely on Michigan v. Summers, 452 U.S. 692 (1981), to support their contention that they have a general right to forcibly detain the occupants of a home when searching for a criminal suspect. We are unpersuaded.
 
 
 26
 In Summers, the Court held that "a warrant to search for contraband that is founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Id. at 705. Summers constitutes an extension of the principle set forth in Terry v. Ohio, 392 U.S. 1 (1968), by permitting the seizure of an individual based on something less than probable cause. See id. at 699. However, the Court expressly noted in Summers that it was not deciding the question of whether such authority accompanies police action justified by exigent circumstances. See id. at 702 n.17. The Court also noted that while its decision would permit a "routine detention" of the residents of a house searched pursuant to a valid warrant, special circumstances or a prolonged detention might lead to a different result. See id. at 705 n.21.
 
 
 27
 Summers does not shield Defendants in the present case, which did not involve a predetermination of probable cause by a judicial officer. Although Defendants urge that they were entitled to handcuff Plaintiffs under the circumstances, the Supreme Court has squarely rejected the idea of "a multifactor balancing test of 'reasonable police conduct under the circumstances' to cover all seizures that do not amount to technical arrests," adhering instead to the traditional probable cause requirement. Dunaway, 442 U.S. at 213. Additionally, taking as true Plaintiffs' version of events, the detention in the present case was not limited or routine as was the detention in Summers. Rather, the officers, with their guns drawn, placed all four of the Plaintiffs in handcuffs, and formally arrested and struck two of them. Indeed, Defendants' treatment of Plaintiffs was more akin to technical arrest than mere investigative seizure. See Brown v. Illinois, 422 U.S. 590, 594 (1975) (likening seizure to arrest where officers drew their guns, informed individual he was under arrest, and handcuffed him). Accordingly, we conclude that Defendants did not have a general right to handcuff and detain at gunpoint the occupants of 395 Stoddart in order to apprehend Carroll.
 
 2. Unlawful Arrests of Ingram and Collins
 
 28
 It is a well-settled principle of constitutional jurisprudence that an arrestwithout probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment. See Donovan v. Thames, 105 F.3d 291, 298 n.7 (6th Cir. 1997). Ingram and Collins allege that Defendants unlawfully seized them by arresting them and placing them behind bars for several hours without probable cause. Defendants charged Ingram and Collins with Obstructing Official Business in violation of Ohio Revised Code § 2921.31. Section 2921.31 provides that "[n]o person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within his official capacity, shall do any act which hampers or impedes a public official in the performance of his lawful duties." Ohio Rev. Code § 2921.31 (Banks-Baldwin 1995).
 
 
 29
 As a preliminary matter, we observe that the termination of criminal proceedings against Ingram and Collins by way of bond forfeiture does not preclude them from raising the claim of arrest without probable cause in the present § 1983 action. Generally, we must give the same preclusive effect, under the doctrines of res judicata and collateral estoppel, to state court judgments that those judgments would receive in courts of the rendering state. See Migra v. Warren City Sch. Bd. of Educ., 465 U.S. 75, 85 (1984). Therefore, we must look to Ohio law to determine the effect that the bond forfeiture has on this action alleging arrest without probable cause in violation of the Fourth Amendment. See Donovan v. Thames, 105 F.3d 291, 294-95 (6th Cir. 1997). Because there is no Ohio decision addressing the preclusive effect of a bond forfeiture on a subsequent § 1983 action for arrest without probable cause, we must look for guidance to Ohio decisions concerning estoppel generally[13]. See Haring v. Prosise, 462 U.S. 306, 314 (1983).
 
 
 30
 Under Ohio law, res judicata "does not bar a subsequent action where the cause of action prosecuted is not the same, even though each action relates to the same subject matter." Norwood v. McDonald, 52 N.E.2d 67, 71 (Ohio 1943). Accordingly, res judicata cannot bar the claims of Ingram and Collins because their § 1983 claim is not the same cause of action as the state's criminal case against them for obstruction. See, e.g., Vinson v. Campbell County Fiscal Court, 820 F.2d 194, 197 (6th Cir. 1987). Moreover, we decline to extend res judicata to bar this claim where there is no indication that Ingram and Collins, who would have been in a defensive posture during criminal proceedings on the obstruction charges, could have raised their § 1983 claims during those proceedings. See Donovan, 105 F.3d at 295-96 & n.5.
 
 
 31
 Ohio law requires that a party asserting the application of collateral estoppel "must prove that the identical issue was actually litigated, directly determined, and essential to the judgment in the prior action." Goodson v. McDonough Power Equip., 443 N.E.2d 978, 985 (Ohio 1983). Issue preclusion will bar relitigation only when the identical issue was actually decided in the first case, and not simply where an issue could have been decided in the first case. See id. at 987. As Ohio law recognizes, it would violate due process to assert collateral estoppel against a party who "had little knowledge or incentive to litigate fully and vigorously in the first action due to the procedural and/or factual circumstances presented therein." Id. at 986. Under the relevant statute, a finding that the officers arrested with probable cause is not an essentialelement of the offense of obstruction of official business. See Ohio Rev. Code § 2921.31 (Banks-Baldwin 1995). In any event, it is clear that the issue of whether Defendants had probable cause to arrest Ingram and Collins was never actually litigated in a prior proceeding.
 
 
 32
 We pause to observe that Ohio courts have stated that a bond forfeiture in a criminal proceeding is an absolute defense to a subsequent state law actions for false arrest. See Neff v. Engle, 501 N.E.2d 675, 676 (Ohio Ct. App. 1986); see also Carpenter v. Meade, No. 93APE09-1306, 1994 WL 64256, at *2 (Ohio Ct. App. Mar. 3, 1994) (unpublished). However, these decisions address the effect of a bond forfeiture only on a state law action for false arrest, not on a federal civil rights action for arrest without probable cause. When we have applied general principles of preclusion, we have hesitated to embrace the presumption that a § 1983 action for the violation of Fourth Amendment rights is the same cause of action as a state law civil claim or criminal proceeding. See, e.g., Donovan, 105 F.2d at 297 (distinguishing § 1983 action for arrest without probable cause from state law action for malicious prosecution); Vinson, 820 F.2d at 197 (distinguishing § 1983 action from state's criminal case against plaintiff).
 
 
 33
 In Ohio, a defendant can prevail in a claim for false arrest even if he lacked probable cause to arrest, as long as he possessed some reasonable basis for believing the accused was guilty. See McFinley v. Bethesda Oak Hosp., 607 N.E.2d 936, 939 (Ohio Ct. App. 1992); see also Hansen v. Westerville City Sch. Dist. Bd. of Educ., Nos. 93-3231, 93-3303, 1994 WL 622153, at *5 (6th Cir. Nov. 7, 1994) (table). Indeed, the claims are legally distinct from one another, as "probable cause for the institution of a criminal prosecution and lawful justification for a detention or confinement... are not... fully synonymous as predicates for tort liability in Ohio." McFinley, 607 N.E.2d at 939. Moreover, a bond forfeiture only "leaves open the question of guilt and possible conviction," Neff, 501 N.E.2d at 676, and does not constitute the direct determination of an issue; under the above delineated principles of Ohio estoppel law, a bond forfeiture therefore could not preclude the present action. As the issue of probable cause was not actually litigated in this case and as, in any event, the bond forfeiture precludes only the relitigation of the issue of the reasonableness of, and not the probable cause for, an arrest, we adhere to our Conclusion that the bond forfeiture does not bar Ingram and Collins from litigating their § 1983 claims for arrest without probable cause in violation of the Fourth Amendment.
 
 
 34
 In dismissing this claim of arrest without probable cause, the district court implicitly assumed that Ingram and Collins in fact interfered with Defendants' attempt to apprehend Carroll. However, in deciding a motion for summary judgment, the district court should have taken as true Plaintiffs' assertions instead of adopting the testimony of Defendants, who claimed that Ingram and Collins obstructed their entry. Plaintiffs produced two affidavits asserting that they did not in any way interfere with the officers who entered their home that afternoon. This factual dispute is material on the question of whether Defendants acted reasonably, and renders erroneous the district court's Conclusion that Plaintiffs raised no genuine issue of material fact as to whether Defendants arrested them without probable cause.
 
 
 35
 Even if we were to accept Defendants' allegation that Ingram and Collins impeded their entry by blocking their path, Defendants may not have had probable cause to arrest them for a violation of § 2921.31. To determine whether officers had probable cause to arrest an individual, we must look to the law of the jurisdiction at the time of the occurrence. See Manetta v. Macomb County Enforcement Team,141 F.3d 270, 276 (6th Cir. 1998). At the time Defendants arrested Ingram and Collins, Ohio law recognized that because warrantless entries by the police are presumptively unreasonable, an individual could "act on that presumption and refuse admission. The Fourth Amendment gives him a constitutional right to refuse entry and search. The assertion of that right cannot be a crime." City of Middleburg Heights v. Theiss, 501 N.E.2d 1226, 1229 (Ohio Ct. App. 1985). In accordance with this principle, Ohio law conferred upon private individuals "at least some limited right to resist entrance, such as locking or closing the door, or physically placing one's self in the officer's way." Id. at 1230. In recognition of these rights, Ohio courts had held, by the time of the 1994 arrests of Ingram and Collins, that the assertion of the constitutional rights to refuse and resist entry could not give rise to an obstruction of Justice violation. See, e.g., State v. Howard, 600 N.E.2d 809, 817 (Ohio Ct. App. 1991); State v. Neftzer, 598 N.E.2d 938, 940-41 (Ohio Clermont County Mun. Ct. 1992). Given the facts as alleged by Ingram and Collins, and the status of Ohio law at the time of their arrests, we conclude that a genuine issue of fact existed as to whether Defendants arrested Ingram and Collins without probable cause, and that summary judgment in favor of Defendants on this claim was therefore inappropriate.
 
 3. Unlawful Seizure of Deborah Womack
 
 36
 Deborah Womack alleges that the officers unreasonably seized her by placing her in handcuffs without probable cause. The Fourth Amendment bars even those "'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime." Terry, 392 U.S. at 16. Significantly, the district court dismissed Deborah Womack's claim without findings.
 
 
 37
 As a preliminary matter, it is clear Defendants "seized" Deborah Womack when they handcuffed her at 395 Stoddart, as she did not feel free to leave at that point. See Mendenhall, 446 U.S. at 553. Under the facts as Plaintiffs have alleged them, Deborah Womack, who is hearing and speech impaired and has been so disabled since the age of one, did not interfere with Defendants when she encountered them. Defendants' own assertions indirectly support this claim. For example, Officer Moore testified that two women were pushing him, keeping their hands out to prevent him from getting through the living room, and screaming obscenities at him. As the police arrested two other women, Ingram and Collins, for obstruction and as Deborah Womack could not have been one of the women screaming obscenities at the officers, we believe a material question exists as to whether Deborah Womack did anything giving rise to reasonable suspicion that would warrant her seizure. Moreover, we observe that Deborah Womack possessed the same right that Ingram and Collins possessed to defend against the warrantless entry by Defendants into her house, the exercise of which could not provide justification for her handcuffing. We therefore conclude that the district court erroneously granted summary judgment in favor of Defendants as to Deborah Womack's claim of unlawful seizure in violation of her Fourth Amendment rights.
 
 4. Unlawful Arrest of Ray Womack
 
 38
 While the record is scant on the issue of Ray Womack's arrest, Defendants characterize the arrest as an error that the officers rectified immediately upon locating and arresting Carroll. Where the police have probable cause to arrest one party but reasonably mistake a second party for the first, their arrest of the second party is valid. See Hill v. California, 401 U.S. 797, 801 (1971); see also Criss v. City of Kent, 867 F.2d 259, 262 (6th Cir. 1988) (noting that "a valid arrest based on then-existing probablecause is not vitiated if the suspect is later found innocent").
 
 
 39
 Plaintiffs do not contest that the officers had probable cause to arrest Carroll. Nevertheless, we believe a genuine issue of fact existed as to whether the officers' mistake in identifying Ray Womack as Carroll was a reasonable one. See Hill, 401 U.S. at 801. As the Supreme Court has recognized, while "room must be allowed for some mistakes" in officers' determinations of probable cause, "the mistakes must be those of reasonable men, acting on facts leading sensibly to their Conclusions of probability." Brinegar v. United States, 338 U.S. 160, 176 (1949). Taking Plaintiffs' assertions as true, Ray Womack was napping in his basement when apprehended by the police and thus could not have been the same man who attempted to sell drugs to Sgt. Dunlap and then outran several officers who were in "hot pursuit." These facts give rise to the genuine issue of whether reasonable police officers would have mistaken a man who was or had been napping for one who had just finished outrunning them at top speed. Additionally, Plaintiffs produced deposition testimony suggesting that Ray Womack and Carroll do not even resemble each other. Specifically, Mrs. Davis testified that "Ray is light complected, very light" but that Carroll, who she knew from the neighborhood, is "[b]lack, black because I'm dark complected, but he was darker than I am, much darker." (J.A. at 65.) As genuine issues of fact exist as to whether Defendants' mistake in arresting Ray Womack was a reasonable one, the district court's grant of summary judgment to Defendants as to Ray Womack's claim was erroneous.
 
 C. Excessive Force
 
 40
 Ingram, Collins and Ray Womack allege that the officers used excessive force in effectuating their arrests. The Supreme Court has held that the Fourth Amendment's ban on unreasonable seizures sets forth the right of an ordinary citizen to be free from the use of excessive force during an arrest or investigatory stop. See Graham v. Connor, 490 U.S. 386, 394 (1989). In determining whether an officer's use of force was "reasonable," courts must perform a "careful balancing of the 'nature and intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. (quoting Tennessee v. Garner, 471 U.S. 7, 8 (1985)).
 
 
 41
 The "reasonableness" inquiry in an excessive force case is an objective one; consequently, we must consider "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397. Moreover, we must Judge the officers' reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396. Proper application of this standard of reasonableness requires close attention to the facts and circumstances of the particular case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[14] Pleasant v. Zamieski, 895 F.2d 272, 276 (6th Cir. 1990).
 
 1. Force Used Against Ingram and Collins
 
 42
 In the present case, the district court questioned the "integrity" of Ingram's version of the facts because although Plaintiffs' affidavits stated the officers had thrown Ingram against the couch, Ingram's medical reports showed she told medical personnel that she had fallen when pushed during a police raid. The district court further found that Plaintiffs' injuries were only "minor" in that the doctor prescribed only ice and Advil, and that there was "no injury whatsoever to the face of Betty Ingram." Finally, the district court found that Ingram and Collins interfered with the officers in their pursuit of Carroll by holding onto them and blocking their path, and that these facts rendered reasonable the officers' use of force against Ingram and Collins. We find the district court clearly erred in making these findings, and in concluding that Ingram and Collins did not raise genuine issues of material fact as to whether the officers unlawfully subjected them to excessive force.
 
 
 43
 At the outset we observe that although faced with a motion for summary judgment by Defendants, the district court disregarded the assertions of Ingram and Collins that they did not interfere with Defendants' entry into their home, and instead credited Defendants' claims to the contrary. Moreover, in questioning Ingram's version of events, the district court ignored her specific charge that the officers struck her in addition to throwing her against the couch. In light of this allegation, Ingram did not contradict her version of events by telling medical personnel she was pushed during a police raid. Indeed, the affidavits state that one officer struck Ingram with such force that her dentures fell as she hit the floor. Moreover, the affidavits set forth that Ingram and Collins did not in any way interfere with the officers who entered their home that afternoon, did not resist arrest, and did not attempt to escape from the officers. Faced with a motion for summary judgment, the district court should have drawn all reasonable inferences in favor of Plaintiffs, and should have taken Plaintiffs' evidence as true. As these issues of fact are material as to whether the officers acted reasonably, the district court erred not only in discrediting Plaintiffs' assertions, but also in finding as a consequence that Plaintiffs had raised no genuine issue of material fact. Cf. Sova v. City of Mount Pleasant, 142 F.3d 898, 903 (6th Cir. 1998).
 
 
 44
 The district court further erred by finding as a matter of law that the officers did not apply excessive force in arresting Ingram and Collins on the grounds that their injuries were not sufficiently severe. In so concluding, the district court asserted, without citation to legal authority, that consideration of the "'nature and quality of the intrusion' must include consideration of the severity of any injury inflicted." To the contrary, we have held that a plaintiff may allege use of excessive force even where the physical contact between the parties did not leave excessive marks or cause extensive physical damage. See Holmes v. City of Massillon, 78 F.3d 1041, 1048 (6th Cir. 1996) (upholding excessive force claim where plaintiff alleged that officers used excessive force in removing her wedding ring). Claims of excessive force do not necessarily require allegations of assault. See Cornwell v. Dahlberg, 963 F.2d 912, 915 (6th Cir. 1992). As we recognized in Holmes, a victim of police brutality may recover under § 1983 for "emotional harm [that] can often be quite difficult to measure in mere monetary terms." 78 F.3d at 1048. In accordance with these legal precedents, the district court erred in finding, as a matter of law, that the officers did not use excessive force against Ingram and Collins on the grounds that they did not suffer sufficient injuries.
 
 2. Force Used Against Ray Womack
 
 45
 Ray Womack claims Defendants used excessive force against him when they handcuffed him and placed him face down on the floor at gunpoint. However,Defendants claim they subjected Ray Womack to such force because they believed he was Carroll. As discussed above, genuine issues of material fact exist as to whether Defendants' mistake in this regard was reasonable. See supra Part III.B.3. If their mistake was reasonable, then the law permitted Defendants to effectuate their arrest using force reasonably necessary from the perspective of a reasonable officer on the scene. See Graham, 490 U.S. at 394; Hill, 401 U.S. at 804-05 (noting that where mistaken identity was reasonable, "police were entitled to do what the law would have allowed them to do" if they in fact had the right man). Consequently, on remand the trier of fact must consider not only whether it was reasonable for Defendants to mistake Ray Womack for Carroll, but also whether it would have been reasonable for Defendants, assuming they reasonably believed he was Carroll, to handcuff their suspect and to place him face down on the floor at gunpoint, given the severity of the crime they reasonably believed Carroll had committed and the danger they reasonably believed that he posed to the safety of others.
 
 D. State Law Claims
 
 46
 Although Plaintiffs waived on appeal their state law claims of malicious prosecution, false imprisonment, and false arrest, they did not waive their right to review of the district court's dismissal of their state law claims for humiliation, indignity, and, in the cases of Betty Ingram and Patricia Collins, severe emotional distress, and Defendants have failed to present any argument in response. In dismissing these claims, the district court asserted that they were "not valid in light of the Court's finding of no wrongdoing on the part of Defendants." Moreover, the district court asserted, without express findings, that in any event Plaintiffs "failed to adduce evidence sufficient to support these claims." Since the district court's Conclusion that no genuine issue of fact exists as to whether Defendants committed no wrongdoing was clearly erroneous, and as we cannot sustain the dismissal of these claims in the absence of proper findings by the district court, see Gaff v. FDIC, 828 F.2d 1145, 1151 (6th Cir. 1987), we find error in the dismissal of Plaintiffs' state law claims for humiliation, indignity, and severe emotional distress.
 
 III.
 
 47
 For the reasons set forth above, we REVERSE the district court's dismissal of Plaintiffs' claim of unreasonable entry in violation of the Fourth Amendment, for although exigent circumstances surrounding the "hot pursuit" of Carroll justified Defendants' failure to obtain a warrant to enter Plaintiffs' home, they did not justify the unannounced entry into Plaintiffs' home. We further REVERSE as to the district court's dismissal of the claims of arrest without probable cause raised by Ingram and Collins, claims of unlawful seizure raised by Ray and Deborah Womack, and claims of the use of excessive force raised by Ingram, Collins, and Ray Womack. Finally, we REVERSE the district court's dismissal of Plaintiffs' state law claims for humiliation, indignity, and severe emotional distress.
 
 
 
 NOTES:
 
 
 [1]
 A "buy-bust" is a pre-arranged police operation whereby the police arrest individuals after they sell narcotics to undercover officers.
 
 
 [2]
 Carroll lived with his aunt and uncle in a building located behind 395 Stoddart Avenue. People in the neighborhood knew him as "Slick." (J.A. at 67.)
 
 
 [3]
 Leona Womack and her children are not plaintiffs in the present lawsuit.
 
 
 [4]
 Defendants dispute this fact, claiming instead that the women were grabbing the officers and holding their arms out to block the officers' path and that the women were screaming and cursing at the officers. Plaintiffs deny that they grabbed the officers or their clothing, that they stood in the officers' way, or that they otherwise interfered with their entry.
 
 
 [5]
 Defendants dispute this fact. In his deposition, Officer Moore claimed instead that two women were "screaming, yelling, and jumped" on the officers in an attempt to block them from taking Carroll, and that they were "holding their arms out, refusing to let me go by them, grabbing onto [me], physically holding onto [me]." (J.A. at 83-84.)
 
 
 [6]
 Indeed, police officers are subject to the knock and announce rule when executing valid arrest warrants. See Wilson, 514 U.S. at 929. This illustrates that different considerations motivate the two Fourth Amendment requirements regarding entry by officers into a private home. The requirement that an officer obtain a warrant before entering a dwelling to arrest a suspect aims to "interpose the magistrate's determination of probable cause between the zealous officer and the citizen." Payton, 445 U.S. at 601. On the other hand, the knock and announce requirement allows individuals "an opportunity to themselves comply with the law and to avoid the destruction of property occasioned by a forcible entry," as well as an opportunity to prepare themselves for the entry. Richards, 520 U.S. at 393 n.5. Moreover, the time officers must spend knocking and announcing is surely shorter than the time they must spend obtaining a warrant. See, e.g., United States v. Spikes, 158 F.3d 913, 926 (6th Cir. 1998) (noting that fifteen to twenty seconds is long enough where drugs are involved).
 
 
 [7]
 Although the Dissent argues that the officers reasonably could have suspected that Carroll could have obtained a weapon from the house, the proposition is, at best, speculation, since the officers themselves never articulated this suspicion. Moreover, the record is devoid of facts to support the reasonableness of such a belief. Indeed, "the presence of a weapon creates an exigent circumstance, provided the government is able to prove they possessed information that the suspect was armed and likely to use a weapon or become violent." Bates, 84 F.3d at 795 (emphasis added). Here, the officers had no information that Carroll was armed, and no information about the likelihood that he would use a weapon. We reject the implicit contention of the Dissent that the fact that Carroll engaged in a petty drug transaction by itself made it reasonable to suspect that he was violent. Cf. Richards, 520 U.S. at 392-94 (rejecting the notion that the "culture" of violence associated with drug felonies could justify a blanket exception to the knock and announce rule).
 
 
 [8]
 Therefore, cases such as United States v. Santana, 427 U.S. 38 (1976), do not resolve the issue. In Santana, the Supreme Court concluded that when in "hot pursuit," the police may enter a home to arrest a suspect without a warrant, and did not address the issue of whether "hot pursuit" excuses the knock and announce requirement. See id. at 42-43.
 
 
 [9]
 While Defendants make no mention of it, their argument appears to reflect the notion that "'[i]n the case of an escape after arrest, the officer, on fresh pursuit of the offender to a house in which he takes refuge, may break the doors to recapture him, in the case of felony, without a warrant, and without notice or demand for admission to the house of the offender.'" Ker v. California, 374 U.S. 23, 54-55 (1963) (Brennan, J., Concurring) (quoting Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 541, 798, 804 (1924)). However, as Justice Brennan observed, an annotation to Semayne's Case, an English case from which most courts have drawn the confines of the Fourth Amendment knock and announce requirement, did not recognize such a "hot pursuit" exception. Specifically, the annotator observed that "'if a man being legally arrested, escapeth from the officer, and taketh shelter though in his own house, the officer may upon fresh suit break open doors in order to retake him, having first given due notice of his business and demanded admission, and been refused.'" Ker, 374 U.S. at 54 n.8 (Brennan, J., Concurring) (quoting Semayne's Case, 77 Eng. Rep. 194, 196 (1603)). Our decision not to adopt a per se "hot pursuit" exception to the knock and announce rule accords with the Court's admonition that "[i]f a per se exception were allowed for each category of criminal investigation that included a considerable--albeit hypothetical--risk of danger to officers or destruction of evidence, the knock-and-announce element of the Fourth Amendment's reasonableness requirement would be meaningless." Richards, 520 U.S. at 394.
 
 
 [10]
 To some extent, it might be argued that knocking and announcing is itself a "senseless ceremony," as ultimately, after knocking and announcing, the police may enter a private dwelling where they have a warrant to do so or circumstances excuse their failure to obtain a warrant. Cf. Spikes, 158 F.3d at 926 (expressing concern that the dilution of the knock and announce rule might turn the requirement itself into a "meaningless gesture"). However, the Court has refused to minimize the importance of the requirement in light of the Fourth Amendment's protection of the privacy interests of the occupants of a home. See Richards, 520 U.S. at 393 n.5; see also Kornegay v. Cottingham, 120 F.3d 392, 399 (3d Cir. 1997) (observing that the fact that "the more prudent entry is the unannounced one" does not transcend the "weighty Fourth Amendment concerns at stake and the sanctity of one's dwelling").
 
 
 [11]
 The Dissent misinterprets our words here to suggest that we would require every officer to determine "whether the fleeing felon was or was not a resident of the house into which he fled, all while actively pursuing the felon." To the contrary, we merely suggest that in the absence of any other reasonable suspicion excusing the requirement, knocking and announcing would not be "mere senseless ceremony" because the Fourth Amendment continues to protect the interests of the other occupants of a home.
 
 
 [12]
 The Dissent points out that police officers must consider "whether the fleeing suspect has taken hostages, obtained a weapon, barricaded himself within, or fled out the back door." These considerations are legitimate ones that may potentially exist every time the police seek to apprehend an individual in a home; however, we would render the knock and announce rule meaningless if we were to hold that the mere possibility of these dangers always excuses the requirement. Rather, the police must actually have good reason, under the circumstances, to suspect that knocking and announcing would be dangerous or futile or would inhibit the investigation.
 
 
 [13]
 The Dissent argues that this Court should skip its analysis of Ohio estoppel law on the grounds that Ohio courts have held that a bond forfeiture precludes a state law action for false arrest. As we will later discuss in more detail, the Dissent errs in that it equates, without any citation to legal authority, a state law action for false arrest under Ohio law with a federal civil rights action for arrest without probable cause.
 
 
 [14]
 Defendants misunderstand the analysis in that they have argued that Carroll posed a danger, and that Carroll resisted arrest and fled from them, for Carroll is not the individual prosecuting an excessive force claim. Indeed, Carroll's misconduct could not possibly justify Defendants' use of excessive force against Ingram and Collins. Rather, this Court must consider whether Ingram and Collins posed a danger or whether they resisted arrest and fled from the police.
 
 
 
 48
 KENNEDY, Circuit Judge, Concurring in part and Dissenting in part. Viewing the evidence in the light most favorable to Plaintiffs, I agree that there are material issues of fact with respect to alleged unlawful seizure of Deborah Womack, the alleged unlawful arrest of Ray Womack, and the excessive force claims. I respectfully Dissent, however, from the panel's holding that police officers in hot pursuit of a felon must knock and announce before entering the building into which the suspect has fled. I also Dissent from the panel's decision holding that the unlawful arrests of Betty Ingram and Patricia Collins are not barred by collateral estoppel, an issue not raised on appeal.
 
 I.
 
 49
 Without citing any definitive authority, the majority opinion today requires police officers to make a split-second, individualized judgment regarding the knock and announce rule while actively pursuing a fleeing felon. Such a result seems to me to require too much. I agree with the majority that exigent circumstances excused the officers from obtaining a warrant before entering the house. However, those same exigent circumstances also should permit police officers to follow a fleeing suspect into a home without knocking and announcing their entry.
 
 
 50
 Although the Supreme Court has not specifically addressed the knock and announce requirement with respect to exigent circumstances, the Court has indicated that a per se rule that exempts police from the knock and announce requirement may be acceptable in certain limited circumstances. In Wilson v. Arkansas, 514 U.S. 927 (1995), the Court suggested that officers need not knock and announce when a threat of physical violence exists, an officer in hot pursuit of a fleeing felon pursues the felon into the felon's residence, or evidence would be destroyed. Id. at 936. The exigent circumstances of hot pursuit, which the Supreme Court has stated permit entry without knock and answer, are the same whether the officers enter the pursued felon's residence or another residence. In both situations, police officers must react instantly, have little time to make a careful decision, and may lose a fleeing suspect. See United States v. Santana, 427 U.S. 38, 42 (1976) (holding that police need not obtain a warrant before chasing a fleeing felon into a home because hot pursuit constitutes an exigent circumstance); United States v. Rohrig, 98 F.3d 1506, 1515-16 (6th Cir. 1996) (same); see also Seymane's Case, 77 Eng. Rep. 194, 198 (K.B. 1603) (the knock and announce rule "shall not extend to protect any person who flies to his house... to escape the ordinary process of law...").
 
 
 51
 If, as Wilson and Seymane's Case note, police officers may chase a suspect into his own home without adhering to the formalities of the knock and announce requirement, then the majority opinion may leave police officers with the unenviable task of determining whether the fleeing felon was or was not a resident of the house into which he fled, all while actively pursuing the felon. Admittedly, when the police officers chase a fleeing felon into another's residence, there is a much greater intrusion on the resident's privacy, as the majority opinion recognizes. However, the greatest intrusion, that of the fleeing felon into the home, already has occurred. In balancing the interests of the homeowner against the police officers' right to enter unannounced, it seems to me that the government has a greater interest in apprehending a dangerous, fleeing felon than the homeowner does in guarding his privacy, which the fleeing felon already has wrongfully invaded. In some sense, the knock and announce requirement is a useless gesture because the occupants, if they are aware of the unwarranted entrance of the fleeing felon, presumably will understand why the police officers have entered their home. Because there is no time to balance the interest of the homeowner against the police officers' right to enter, I would hold that police officers act reasonably in light of the exigent circumstances by pursuing a fleeing felon into an unknown house without adhering to the knock and announce requirement[1]. The need to act quickly in pursuit of a fleeing felon puts this case into the category of cases in which the balancing of interests must be conducted with "an eye to the generality of cases" and the practical realities. See Wyoming v. Houghton, 526 U.S. ___,119 S. Ct. 1297, 1303 (1999).
 
 
 52
 Contrary to these considerations, the majority relies on the Supreme Court's latest Discussion of the knock and announce rule in Richards v. Wisconsin, 520 U.S. 385 (1997), which struck down Wisconsin's per se rule exempting officers from complying with the knock and announce requirement in drug cases "based on the 'culture' surrounding a general category of criminal behavior," namely drug activity. 520 U.S. at 392. Unlike the majority, I do not find Richards dispositive of this case. Although I agree that Richards stands for the proposition that courts may not craft exceptions to the knock and announce rule based on particular crimes or criminal activity, the Court based its holding on two general concerns--the overgeneralization that all drug crimes pose a substantial degree of risk to the officers and the public, and the fear that the States would exempt officers from complying with the rule in cases that concern certain non-specific types of crime, e.g., crimes that involve dangerous weapons, etc. Id. at 393-94. Nothing in Richards overrules or calls into doubt Wilson's language exempting certain exigent circumstances from the knock and announce requirement.
 
 
 53
 The majority also suggests that a per se hot pursuit exception would render the knock and announce rule meaningless. Certainly this would be true if we exempted police officers from complying with the requirement in certain random instances, such as the drug felonies in Richards, all cases that have the potential for violence, or those that involve minor offenses. See, e.g., Welsh v. Wisconsin, 466 U.S. 740, 753-54 (1984) (holding that exigent circumstances did not exist to justify a warrantless entry into a home in search of a drunk driver who had swerved off the road and drove away because the offense was a misdemeanor and "there was no immediate or continuous pursuit of the petitioner from the scene of a crime"). However, Richards acknowledges that exigent circumstances may excuse the failure to knock and announce. The majority opinion implies that hot pursuit alone is not an exigent circumstance for purposes of the knock and announce requirement, but such an approach imposes additional exigent circumstances (e.g., felon must be armed or dangerous) upon exigent circumstances that already exist (hot pursuit). No Supreme Court case states or even implies that this piling of exigent circumstances upon exigent circumstances is necessary or even correct.
 
 
 54
 In hindsight, there may be instances where the knock and announce rule would have advantages, but courts cannot second guess police officers who do not always know or have time to discover all of the relevant circumstances before chasing a fleeing felon into a house. While in hot pursuit there is no way to determine whether the fleeing suspect has taken hostages, obtained a weapon, barricaded himself within, or fled out the back door, all of which are possible scenarios. Officers, concerned for their own safety, may knock and announce their entry if they feel it is prudent to do so. If denied entry, the officers will have no way of knowing whether the fleeing felon is controlling the residents' response. The knock and announce requirement will give the fugitive time to secure his or her position. Based on these considerations, I see no reason to exclude hot pursuit of a fleeing felon into an unknown home generally as one of the exemptions noted in Wilson and I would hold that the exigent circumstances of hot pursuit in this case excused the officers from complying with the knock and announce requirement. See United States v. Flores, 540 F.2d 432, 435 (9th Cir. 1976) (stating that hot pursuit constitutes one exception to the knock and announce requirement)II.
 
 
 55
 I also respectfully Dissent from the majority's holding regarding the allegedly unlawful arrests of Betty Ingram and Patricia Collins. While the issue was raised below, the district court did not address the issue nor did either of the parties on appeal. We do not ordinarily address issues not raised by the parties and I would not do so now. However, since I disagree with my colleagues' analysis of the collateral estoppel issues involved, I will address the issue.
 
 
 56
 As my colleagues point out, we must give the same preclusive effect to state court judgments as those judgments would receive in the courts of the rendering state. Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984). This principle applies to civil rights actions under § 1983 with respect to issues actually litigated in the state courts (collateral estoppel), Allen v. McCurry, 449 U.S. 90, 97-99 (1980), as well as those issues that were not raised but could have been litigated in the state court proceeding (res judicata). Migra, 465 U.S. at 84. Nonetheless, preclusion does not bar a § 1983 action "where the party against whom an earlier court decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court." Allen, 449 U.S. at 101. Here, since Ingram and Collins faced criminal charges in the Ohio courts and forfeited their bond, the initial question is whether the rules of preclusion, as applied by the Ohio courts, would bar a later civil suit based on the legality of the arrests.[2] See Migra, 465 U.S. at 85 ("We hold, therefore, that petitioner's state-court judgment in this [§ 1983] litigation has the same preclusive effect in federal court that the judgment would have in the Ohio state courts."); see also Donovan v. Thames, 105 F.3d 291, 298 (6th Cir. 1997) (arrestee was collaterally estopped from bringing § 1983 action for false arrest when state trial court already had determined that the arrest was valid under state law because the police officers had probable cause); Walker v. Schaeffer, 854 F.2d 138, 143 (6th Cir. 1988) (holding that arrestees, who pled nolo contendre in state criminal proceedings, were estopped from bringing § 1983 action that alleged false arrest).
 
 
 57
 In Neff v. Engle, 501 N.E.2d 675 (Ohio Ct. App. 1986), the Ohio Court of Appeals expressly stated: "Accordingly, we hold that a bond forfeiture in a criminal proceeding, as a compromise or settlement, is an absolute defense to an action for false arrest or false imprisonment." Id. at 676; see also Davis v. Muncy, No. 91-4150, 1992 WL 236880, at *1 (6th Cir. Sept. 24, 1992) (table) (finding that, under Ohio law, bond forfeiture precluded plaintiff from pursuing a claim for false arrest under § 1983); Carpenter v. Meade, No. 93APE09-1306, 1994 WL 64256, at *2 (Ohio Ct. App. March 3, 1994) (reaffirming Neff). While the Neff case concerned false imprisonment rather than false arrest, there is no reason to conclude that the court did not intend its holding to apply to false arrest. See McFinley v. Bethesda Oak Hospital, 607 N.E.2d 936, 940-41 (Ohio Ct. App. 1992) ("[F]alse arrest and false imprisonment as causes of action are indistinguishable. The only distinction lies in the manner in which they arise."). Indeed, to read the express language of the Neff opinion otherwise renders the language meaningless. Thus, the bond forfeiture is equally a compromise or settlement in a false imprisonmentcase as it is in a false arrest case[3]. Further, neither Plaintiff asserts that she did not have a full and fair opportunity to litigate the claim on the merits. (The lack of a record in this regard illustrates why we should not decide issues not raised on appeal.) Despite the majority's attempt to ignore this precedent and apply general collateral estoppel principles to this case, I would hold that the bond forfeitures here preclude the false arrest claims of both Betty Ingram and Patricia Collins. See Haring v. Prosise, 462 U.S. 306, 314 (1983) (stating that federal courts should first look to a state court decision on point before turning to general collateral estoppel principles under state law).
 
 III.
 
 58
 In sum, I concur in the majority's decision to reverse the district court with respect to the alleged unlawful seizure of Deborah Womack, the alleged unlawful arrest of Ray Womack, and the excessive force claims. I respectfully Dissent, however, from the majority's holding that requires police officers to knock and announce their presence while chasing a fleeing felon into an unknown home. Instead, I would hold that the exigent circumstance of hot pursuit vitiate the need to knock and announce. Finally, I also would affirm the district court's holding that the bond forfeitures by Betty Ingram and Patricia Collins preclude their § 1983 false arrest claims.
 
 
 
 NOTES:
 
 
 [1]
 Although the majority argues that the police officers here did not suspect the fleeing felon of having a weapon, they reasonably could have suspected that he may obtain one in the house.
 
 
 [2]
 The majority opinion states that this Dissent errs by equating "a state law action for false arrest under Ohio law with a federal civil rights action for arrest without probable cause." To the contrary, Allen and Migra require us to look at the preclusive effect Ohio law would grant to the bond forfeiture in a later false arrest claim, even if the Ohio decision is not in a § 1983 context. The relevant inquiry under Allen and Migra is whether Ohio would apply collateral estoppel to the earlier state court decision. If so, then the same preclusion applies in federal court under § 1983.
 
 
 [3]
 The majority opinion makes much of the fact that the defendants can prevail in this cause of action without a showing of probable cause. Even so, Ingram and Collins were charged with obstruction of Justice because of their alleged efforts to resist arrest. Had they challenged the obstruction of Justice charges rather than forfeit their bond, the state court would have made a determination of whether they legitimately resisted arrest and thus whether the officers had probable cause to arrest them. Both Plaintiffs thus had adequate opportunity to challenge their arrest and failed to do so. Consequently, I do not find it unfair to preclude them from bringing a § 1983 claim that arose from this same incident and concerns the same issues.