**IN RE: ENERGY CONVERSION**

DEVICES, INC., et al.,[1]
Debtors.

John Madden, Liquidation
Trustee, Plaintiff,

v.

Mark Morelli, Defendant.

Case No. 12–43166 (Jointly
Administered)
Adv. Pro. No. 13–4958

United States Bankruptcy Court,
E.D. Michigan, Southern Division.

Signed April 15, 2016

1. The Debtors in these jointly-administered cases are Energy Conversion Devices, Inc. (Case No. 12–43166) and United Solar Ovonic LLC (Case No. 12–43167).

Robert S. Hertzberg, James D. VandeWyngearde, Lesley S. Welwarth, Southfield, MI, for Plaintiff.

David G. Dragich, Amanda Carol Vintevoghel, Grosse Pointe Woods, MI, for Defendant.

## OPINION REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT

Thomas J. Tucker, United States Bankruptcy Judge

## I. Introduction

This is a preference and fraudulent transfer case, in which the Plaintiff seeks to avoid two transfers totaling $1.3 million, and recover that amount from the Defen-

dant, plus interest. The case raises several issues, including issues about the "insolvency" element of Plaintiff's preference claim under 11 U.S.C. § 547(b)(3); application of the "more than" element of Plaintiff's preference claim under 11 U.S.C. § 547(b)(5); and Defendant's affirmative defenses to preference avoidance under 11 U.S.C. §§ 547(c)(1) (contemporaneous new value) and 547(c)(2)(ordinary course of business).

This adversary proceeding is before the Court on the parties' cross-motions for summary judgment.[2] The Court held a hearing on the motions and took them under advisement.

For the reasons stated in this opinion, the Court will grant summary judgment in part for each party, and deny summary judgment to each party in part. Plaintiff cannot avoid either of the transfers at issue as a fraudulent transfer. Nor can Plaintiff avoid, as a preferential transfer under 11 U.S.C. § 547, the first of the two transfers, made on May 27, 2011 in the amount of $583,270. What survives for trial is Plaintiff's claim to avoid, as a preferential transfer under § 547, the second transfer made to Defendant on December 9, 2011 in the amount of $703,800. As to that claim, the Court's opinion and order will substantially narrow the issues for trial, under Fed. R. Civ. P. 56(g). Trial will be limited to specific issues relating to Plaintiff's "more than" element under § 547(b)(5).

## II. Background and facts

### A. Facts

The following facts are undisputed.

### 1. Chapter 11 bankruptcy cases filed February 14, 2012

The Plaintiff in this adversary proceeding is the Liquidation Trustee of the Ener-

gy Conversion Devices Liquidation Trust. The Trust was created, and Plaintiff acts as Trustee, as a result of the confirmed liquidation Plan in the Chapter 11 bankruptcy cases of Energy Conversion Devices, Inc. ("ECD") and its wholly-owned operating subsidiary, United Solar Ovonic LLC ("USO"). Those Debtors filed their voluntary Chapter 11 bankruptcy petitions in this Court on February 14, 2012.

On July 30, 2012, the Court confirmed a joint liquidating plan proposed by the Debtors (the "Plan").[3] The Plan included the substantive consolidation of the ECD and USO estates. The effective date of the Plan was August 28, 2012.[4] Under the Plan, John Madden was appointed the Liquidation Trustee, and in that capacity he filed this adversary proceeding.

### 2. The May 6, 2011 Separation Agreement and the May 26, 2011 transfer

From July 2007 until May 6, 2011, Defendant Mark Morelli was the President and Chief Executive Officer of ECD. On May 4, 2011, ECD's Board of Directors decided to terminate Defendant, effective May 6, 2011. The Board adopted a resolution during its May 4, 2011 meeting, which "accept[ed] and confirm[ed] the resignation and removal, effective as of 5:00 p.m. Eastern time on May 6, 2011 ... of Mark Morelli as the President and Chief Executive Officer," and "the resignation of Mr. Morelli as a member of the [ECD] Board, and the resignation and removal of Mr. Morelli as a director and officer of all other affiliates of [ECD]."[5] In that same resolution, the Board authorized and directed ECD "to enter into a Separation Agreement with Mr. Morelli in substantially the form attached as *Exhibit A* to these resolutions[.]"[6] (This "Exhibit A" is not in the record.)

After May 6, 2011, Defendant was no longer an officer, director, or employee of ECD or USO.

Between May 4 and May 6, 2011, ECD and Defendant negotiated and finalized Defendant's Separation Agreement, each with the assistance of counsel. They signed and entered into the Separation Agreement on May 6, 2011, which is also the stated date of the agreement.[7] The Separation Agreement recited that Defendant's employment with ECD "will terminate effective May 6, 2011...."[8] And the Separation Agreement recited that "[t]his [Separation] Agreement is intended to implement the [Executive Severance] Plan ... subject only to those modifications expressly set forth in this [Separation] Agreement."[9]

The Agreement recited that Defendant was a participant in ECD's "Executive Severance Plan, effective July 24, 2007 as amended through September 30, 2008[.]"[10]

The Separation Agreement provided that the "[t]he base salary and bonus benefits to which [Defendant] is entitled under Section 4.1 of the [Executive Severance] Plan will be payable on the dates and in

---

**3.** Docket # 1064 in Case No. 12–43166, the "Order Confirming Plan." The Plan was filed on June 20, 2012 (Docket # 754 in Case No. 12–43166, the "Plan").

**4.** *See* Notice of Effective Date, etc. (Docket # 1220 in Case No. 12–43166).

**5.** Docket # 33, Ex. D, pdf pp. 2, 4.

**6.** *Id.* at pdf p. 4 (underlining in original).

**7.** Docket # 33, Ex. E.

**8.** *Id.* at pdf p. 2 ¶ C.

**9.** *Id.* at pdf p. 2 ¶ D.

**10.** *Id.* at pdf p. 2 ¶ A. A copy of the Executive Severance Plan is in the record at Docket # 33, Ex. B.

the amounts set forth on *Schedule* A."[11] Schedule A, in turn, listed amounts payable to Defendant totaling $1,977,885.00. This total amount was to be paid as follows:

- $583,270.00 to be paid "as a lump sum by wire transfer ... seven days after the Release [signed by Defendant] ceases to be revocable,"[12]
- $386,730.00 to be paid in 39 equal installments of $9,916.15 "on normal payroll dates commencing November 11, 2011,"

and

- $1,007,885.00 to be paid in a lump sum by wire transfer on November 7, 2011.[13]

Under the Separation Agreement, the parties also agreed to the following, as summarized in Defendant's brief:

> In order to receive severance payments pursuant to the [Executive] Severance Plan, Mr. Morelli confirmed that he would be subject to and would abide by the covenants as set forth in Section 5 of the Severance Plan. *Separation Agreement,* p. 3, ¶ 3. These covenants included noncompetition, agreement not to interfere with business relations, agreement to keep certain information confidential, non-disparagement, and cooperation. *Id.* Further, in consideration of the severance payments, Mr. Morelli provided a release in favor of the Debtor. The release purported to extinguish the Debtor's liability relating to any and all claims, demands, actions, and lia-

bilities that Mr. Morelli may have otherwise asserted arising out of his employment with the Debtor, including termination of the employment (the "Separation Release"). See *Separation Agreement.* Mr. Morelli also relinquished his right to collect pursuant to the "Change of Control" provision as defined in the Debtor's 2006 Stock Incentive Plan, attached hereto as Exhibit F.[14]

The parties agree that about three weeks after ECD and Defendant signed the Separation Agreement, namely "[o]n or around May 27, 2011," ECD paid Defendant $583,270.00. This was the first lump sum amount due under the Separation Agreement, described above. This is the first of the two transfers that Plaintiff now seeks to avoid and recover (the "May 2011 Transfer").

### 3. The December 6, 2011 Settlement Agreement and the December 9, 2011 transfer

After the May 2011 Transfer, ECD still owed to Defendant, under the Separation Agreement, $1,007,885.00 to be paid on November 7, 2011, plus $386,730.00 to be paid in 39 equal installments beginning November 11, 2011.

ECD did not make these further payments to Defendant. Instead, and because of ECD's financial problems, a restructuring firm hired by ECD (AlixPartners) contacted Defendant in November 2011, seeking to renegotiate ECD's obligations to Defendant under the Separation Agreement. The parties were each represented

---

11. *Id.* at pdf p. 3 § 2(a); *see also* pdf p. 2 § 1(b).

12. The "Release" referred to in Schedule A, in turn, was attached as Exhibit A to the Separation Agreement, and was signed by Defendant on May 6, 2011.

13. *Id.* at pdf p. 6, Schedule A.

14. Def.'s Br. in Supp. of Mot. for Summ. J. (Docket # 33) at 2.

by counsel in these negotiations, and the result was an agreement entitled "Settlement Agreement" which ECD and Defendant each signed on December 6, 2011, and which was effective that day.[15]

The Settlement Agreement recited, among other things, that:

> the Company has announced that it has begun discussions with representatives of an informal group of note-holders regarding the Company's repositioning efforts and to explore the group's interest in restructuring the Company's obligations, and the Company has further announced that, if it is unable to reach an accord with the note-holders, the Company may choose to seek reorganization under the U.S. Bankruptcy Code[.] [16]

In the Settlement Agreement, the parties agreed that ECD would pay Defendant a one-time payment of $703,800.00, in lieu of any payments otherwise due under the Separation Agreement. The Settlement Agreement provided that this payment "shall be made simultaneously with the execution of this Settlement Agreement." [17]

The parties agree that shortly after ECD and Defendant executed the Settlement Agreement, namely on or about December 9, 2011, ECD paid the $703,800.00 lump sum to Defendant under the Settlement Agreement. This is the second of the two transfers to Defendant that Plaintiff seeks to avoid and recover (the "December 2011 Transfer").

### B. Plaintiff's Complaint

Plaintiffs's complaint contains three counts. Count 1 seeks to avoid the May 2011 Transfer and the December 2011 Transfer (collectively, the "Transfers"), as preferential transfers under 11 U.S.C. § 547. Count 2 seeks, alternatively, to avoid both transfers as constructively fraudulent transfers, under 11 U.S.C. § 548 and under the Michigan Uniform Fraudulent Transfer Act, Mich. Comp. Laws §§ 566.35 et seq, using the strong arm powers under 11 U.S.C. § 544. Count 3 seeks to recover the avoided transfers from Defendant, the initial transferee, under 11 U.S.C. § 550.

### III. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D.Mich.). All of Plaintiff's claims in this adversary proceeding are core proceedings, under 28 U.S.C. §§ 157(b)(2)(F) and 157(b)(2)(H).

In addition, this proceeding falls within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within either of these categories in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen (In re Trans-Industries, Inc.)*, 419 B.R. 21, 27 (Bankr. E.D.Mich.2009). This is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," *see id.* namely Bankruptcy Code §§ 544, 547, 548, and 550. And this is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *See Allard v. Coenen*, 419 B.R. at 27.

For these reasons, this Court has *statutory* authority, under 28 U.S.C.

---

**15.** Docket # 33, Ex. G (the "Settlement Agreement").

**16.** *Id.* at 1.

**17.** *Id.* at ¶ 1.

§ 157(b)(1), to enter a final judgment on Plaintiff's claims. If and to the extent this Court might otherwise lack *constitutional* authority to enter a final judgment, under *Stern v. Marshall*, 564 U.S. 462, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), such a problem does not exist in this case. This is because both parties in this adversary proceeding have expressly, knowingly, and voluntarily consented to this bankruptcy court entering a final order or judgment, as permitted by 28 U.S.C. § 157(c)(2).[18] Given that consent, this bankruptcy court has both statutory and constitutional authority to enter a final judgment on Plaintiff's claims. *See Wellness Int'l Network, Ltd. v. Sharif*, —— U.S. ——, 135 S.Ct. 1932, 191 L.Ed.2d 911 (2015).

## IV. Discussion

### A. Summary judgment standards

As this Court has stated previously, in *McCallum v. Pixley* (*In re Pixley*), 456 B.R. 770, 774–75 (Bankr.E.D.Mich.2011):

> Fed. R. Civ. P. 56(a), applicable to bankruptcy adversary proceedings under Fed. R. Bankr. P. 7056, provides that a motion for summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149–50 (6th Cir. 1995), the court elaborated:
>
>> The moving party has the initial burden of proving that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. To meet this burden, the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the failure of the

nonmoving party to produce any evidence which would create a genuine dispute for the [trier of fact]. Essentially, a motion for summary judgment is a means by which to challenge the opposing party to 'put up or shut up' on a critical issue.

>> If the moving party satisfies its burden, then the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by [the trier of fact]. In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party. However, if the evidence is insufficient to reasonably support a ... verdict in favor of the nonmoving party, the motion for summary judgment will be granted. Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff.

>> . . .

>> Finally, the Sixth Circuit has concluded that, in the "new era" of summary judgments that has evolved from the teachings of the Supreme Court in *Anderson* [*v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ], *Celotex [Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ] and *Matsushita [Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ], trial courts have been afforded considerably more discretion in evaluating the

---

**18.** *See* Adversary Proceeding Scheduling Order (Docket # 8) at 2 ¶ I(d).

weight of the nonmoving party's evidence. The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. If the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the nonmoving party, the motion should be granted.

*Id.* (internal quotation marks and citations omitted). In determining whether the moving party has met its burden, a court must "believe the evidence of the nonmovant, and draw all justifiable inferences in favor of the nonmovant." *Ingram v. City of Columbus,* 185 F.3d 579, 586 (6th Cir.1999)(relying on *Russo v. City of Cincinnati,* 953 F.2d 1036, 1041–42 (6th Cir.1992)).

### B. The May 2011 Transfer is not avoidable as a preference.

Defendant argues that the May 2011 Transfer is not avoidable as a preference because the transfer was made more than 90 days before the bankruptcy petition

date, and Defendant was not an "insider" at the time. of the transfer. As a result, Defendant argues, one of the necessary elements for avoidance under § 547(b) is missing. *See* 11 U.S.C. § 547(b)(4).[19]

■ Defendant clearly was not an "insider" of ECD when the transfer was made on May 26, 2011. After his termination on May 6, 2011, Defendant was no longer an officer, director, or employee of ECD. And after May 6, 2011, Defendant had no control whatsoever over ECD. For these reasons, Defendant clearly was not an "insider" under 11 U.S.C. § 101(31) when the May 2011 Transfer was made on May 26, 2011.[20] Because that transfer was made more than 8 months before the February 14, 2012 petition date—well outside the 90 day preference period—it is not avoidable under § 547 as a preference.

Plaintiff has not contested this argument by Defendant. Instead, Plaintiff has expressly abandoned his claim in Count 1 that the May 2011 Transfer is avoidable as a preference. Plaintiff now only claims that this transfer is avoidable as a fraudu-

---

**19.** The elements for avoidance of a preferential transfer which Plaintiff must prove under §§ 547(b) and 547(g) are:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property–

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, **if such creditor at the time of such transfer was an insider;** and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (emphasis added).

**20.** When the debtor is a corporation, as here, the term "insider" is defined to include the following:

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer, or person in control of the debtor;

11 U.S.C. § 101(31)(B).

lent transfer, as pled alternatively in Count 2.

For these reasons, the Court will grant summary judgment for Defendant on, and dismiss with prejudice, Plaintiff's preference claim in Count 1, with respect to the May 2011 Transfer.

## C. Neither the May 2011 Transfer nor the December 2011 Transfer is avoidable as a fraudulent transfer.

Defendant seeks summary judgment on Count 2 of the complaint, arguing that neither the May 2011 Transfer nor the December 2011 Transfer is avoidable as a constructive fraudulent transfer. The Court agrees with this conclusion, for the following reasons.

Plaintiff's fraudulent transfer claim under 11 U.S.C. § 548 does not allege that either of the transfers was made "with actual intent to hinder, delay, or defraud" any creditor of ECD, within the meaning of § 548(a)(1)(A). Rather, Plaintiff alleges what is commonly called a "constructive" fraudulent transfer claim, based on § 548(a)(1)(B). Under that statutory provision, Plaintiff must prove, among other elements, that the Debtor "received less than a reasonably equivalent value in exchange for" the transfer. Section 548(a)(1)(B) states:

(a)(1) **The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property,** or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, **that was made** or incurred **on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—**

. . .

(B)(i) **received less than a reasonably equivalent value in exchange for such transfer or obligation;** and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B) (emphasis added).

Defendant argues, among other things, that the Debtor ECD received "reasonably equivalent value" in exchange for each of the Transfers. Section 548 has its own definition of "value," and the term includes "the satisfaction of a present or antecedent debt of the debtor." Section 548((d)(2)(A) states:

In this section—

(A) "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor[.]

11 U.S.C. § 548(a)(2)(A).

While Defendant makes several arguments about all the "value" that ECD re-

ceived from him in exchange for the May 2011 and December 2011 Transfers, the Court finds one such argument to be dispositive, and finds it unnecessary to discuss the other arguments. On the undisputed facts before the Court, it is clear that ECD received "reasonably equivalent value" in exchange for each transfer, in the form of the "satisfaction of a present or antecedent debt" that ECD owed to Defendant at the time of each transfer.

■ When ECD made the May 2011 Transfer to Defendant of $583,270.00 on May 26, 2011, that transfer satisfied, to the extent of $583,270.00, a "present or antecedent debt" that ECD owed to Defendant under the May 6, 2011 Separation Agreement.[21] The payment could also be viewed as satisfying, to the extent of $583,270.00, an antecedent debt that ECD owed to Defendant under the July 24, 2007 Executive Severance Plan, as amended through September 30, 2008, since the parties agreed in the recitals in the Separation Agreement that the Separation Agreement was "intended to implement the [Executive Severance] Plan ... subject only to those modifications expressly set forth in [the Separation] Agreement."[22] But in any event, ECD received "value" for the May 2011 Transfer in the same amount as the transfer, in the form of the satisfaction of $583,270.00 in debt that ECD owed to Defendant. This was not just "reasonably equivalent value"—it was value exactly equal to the amount of the May 2011 Transfer.

Plaintiff does not seriously dispute this. Rather, Plaintiff's own complaint admits, in Count 1, that both the May 2011 Transfer and the December 2011 Transfer were "made for or on account of an antecedent debt owed by one or both of the Debtors to Defendant before the Transfers were made."[23]

For these reasons, the May 2011 Transfer cannot be avoided as a fraudulent transfer under § 548(a)(1)(B).

■ The same thing is true with respect to the December 2011 Transfer. When ECD made the December 2011 Transfer to Defendant of $703,800.00 on December 9, 2011, that transfer satisfied "present or antecedent debt" that ECD owed to Defendant, in the form of the $703,800.00 debt ECD owed Defendant under the December 6, 2011 Settlement Agreement.[24] Before ECD and Defendant made the Settlement Agreement on December 6, 2011, it is undisputed that ECD owed Defendant much more than $703,800.00, under the Separation Agreement—roughly $1.4 million. *See* discussion in Parts II–A–3 and IV–D–2 of this opinion. And when these parties made the Settlement Agreement on December 6, 2011, and thereafter until the December 2011 Transfer was made on December 9, 2011, ECD had a contractual obligation to pay Defendant $703,800.00 in

---

**21.** It is clear that Plaintiff is *not* seeking to avoid the May 6, 2011 Separation Agreement, as itself being a fraudulent *obligation* under § 548(a) or on any other basis. No such avoidance claim is pled in Plaintiff's complaint, and Plaintiff expressly disavowed such an avoidance claim during the hearing on the summary judgment motions. *See* Tr. (Docket # 69) at 23–24, 31, 34, 42.

**22.** Separation Agreement (Docket # 33, Ex. E.) at 1 ¶ D.

**23.** Compl. (Docket # 1) at ¶ 26.

**24.** As with the May 6, 2011 Separation Agreement, it is clear that Plaintiff is *not* seeking to avoid the December 6, 2011 Settlement Agreement, as itself being a fraudulent *obligation* under § 548(a) or on any other basis. No such avoidance claim is pled in Plaintiff's complaint, and Plaintiff specifically disavowed such an avoidance claim during the hearing on the summary judgment motions. *See* Tr. (Docket # 69) at 31.

order to satisfy the $1.4 million debt under the Separation Agreement. The payment of that amount by ECD to Defendant on December 9, 2011 satisfied that debt. The December 2011 Transfer, therefore, was in exchange for reasonably equivalent (indeed, equal) value in the form of the satisfaction of ECD's debt to Defendant.

Plaintiff does not seriously dispute this. As noted above, Plaintiff's complaint alleges that the December 2011 Transfer was on account of antecedent debt owed to Defendant. Plaintiff's summary judgment briefs argue that this transfer was on account of antecedent debt owed by ECD to Defendant.[25] And Plaintiff's counsel expressly argued and admitted, during the summary judgment motion hearing, that this transfer was on account of such an antecedent debt.[26]

For these reasons, the December 2011 Transfer cannot be avoided as a fraudulent transfer under § 548(a)(1)(B).

Nor can the May 2011 Transfer or the December 2011 Transfer be avoided under Michigan's version of the Uniform Fraudulent Transfer Act, Mich. Comp. Laws §§ 566.31, *et seq.* Plaintiff's allegations relating to this claim, in Count 2 of the Complaint, can be construed as seeking to avoid the May 2011 and December 2011 Transfers based on the constructive fraudulent transfer provisions of Mich. Comp. Laws §§ 566.34(1) and 566.35(1). Both of those provisions require Plaintiff to prove that ECD did not receive "a reasonably equivalent value in exchange" for the transfers.[27] And as with Bankruptcy Code § 548, the Michigan fraudulent transfer statute defines "value" to include the satisfaction of an antecedent debt. *See* Mich. Comp. Laws § 566.33(1).[28]

For these reasons, Plaintiff's constructive fraudulent transfer claims, with respect to both the May 2011 Transfer and the December 2011 Transfer, fail under

25. *E.g.,* Pl.'s Br. (Docket # 36, Ex. 3) at 5–6.

26. Tr. (Docket # 69) at 7, lines 3–6.

27. Section 566.34(1) states:

(1) **A transfer made** or obligation incurred **by a debtor is fraudulent as to a creditor,** whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, **if the debtor made the transfer** or incurred the obligation in either of the following:
(a) With actual intent to hinder, delay, or defraud any creditor of the debtor.
(b) **Without receiving a reasonably equivalent value in exchange for the transfer or obligation,** and the debtor did either of the following:
(i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
(ii) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Mich. Comp. Laws § 566.34(1)(emphasis added). Section 566.35(1) states:

(1) **A transfer made** or obligation incurred **by a debtor is fraudulent as to a creditor** whose claim arose before the transfer was made or the obligation was incurred **if the debtor made the transfer** or incurred the obligation **without receiving a reasonably equivalent value in exchange for the transfer** or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Mich. Comp. Laws § 566.35(1) (emphasis added).

28. Section 566.33(1) states:

**Value is given for a transfer** or an obligation **if, in exchange for the transfer** or obligation, property is transferred or **an antecedent debt is** secured or **satisfied.** Value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

Mich. Comp. Laws § 566.33(1)(emphasis added).

the Michigan fraudulent transfer statutes.[29]

For these reasons, Defendant is entitled to summary judgment on Plaintiff's fraudulent transfer claims—Count 2 of the Complaint, and the Court will dismiss that Count with prejudice.

### D. The Court cannot grant summary judgment for either party on Plaintiff's claim to avoid the December 2011 Transfer as a preference under 11 U.S.C. § 547.

Based on the undisputed facts and the present record, the Court cannot grant summary judgment for either Plaintiff or Defendant on Count 1, with respect to the December 2011 Transfer. A trial will be required to determine whether the $703,800.00 transfer is to be avoided as a preference under 11 U.S.C. § 547. The Court will narrow the issues for trial, under Fed. R. Civ. P. 56(g), consistent with the following discussion, but the Court concludes that a trial will be necessary regarding one of the elements of Plaintiff's preference claim.

There is no dispute that three of the five elements under 11 U.S.C. § 547(b) are met, for avoidance of the December 2011 Transfer. Those undisputed elements are that the transfer was a transfer of property of the Debtor ECD to Defendant "to or for the benefit of a creditor;" "for or on account of antecedent debt owed by the" Debtor ECD "before such transfer was made;" and that the transfer was made within 90 days before the date of the filing of ECD's bankruptcy petition. *See* 11 U.S.C. §§ 547(b)(1), 547(b)(2); 547(b)(4)(A).

The parties disagree about the two other elements under § 547(b). Defendant argues that the Debtor ECD was not "insolvent" when the December 2011 Transfer was made, as required by § 547(b)(3), and that the transfer does not meet the so-called "more than" test under § 547(b)(5). Defendant also argues two affirmative defenses under § 547(c), which are discussed later in this opinion.

#### 1. The insolvency element under § 547(b)(3)

Plaintiff claims that when the December 2011 Transfer was made, on December 9, 2011, the Debtor ECD was "insolvent," as required by § 547(b)(3). Defendant disputes this.

With respect to a corporate debtor, like ECD,

> [t]he term "insolvent" means—
>
> (A) ... financial condition such that the sum of such entity's debts is

---

**29.** There is another provision in the Michigan fraudulent transfer statutes that does not include the no-reasonably-equivalent-value element, and that does not require actual fraudulent intent. That is Mich. Comp. Laws § 566.35(2), which states:

> (2) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

But Plaintiff did not plead a claim based on this provision in the Complaint. *See* Compl. (Docket # 1) at ¶¶ 33–34. Nor did Plaintiff argue this Michigan statutory provision in his summary judgment motion or briefs, or at the hearing on the summary judgment motions. Moreover, even if Plaintiff had pled and argued such a claim, it clearly would have failed in this case, because when the transfers at issue were made to Defendant (May 26, 2011 and December 9, 2011), Defendant clearly was not an "insider" of ECD. *See* discussion in Part IV–B of this opinion. (The Michigan statute's definition of "insider" is in substance identical to the Bankruptcy Code § 101(31) definition, quoted in Part IV–B of this opinion. *See* Mich. Comp. Laws § 566.31(1)(g).)

greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title[.]

11 U.S.C. § 101(32)(A).

"For purposes of [§ 547], the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f). Plaintiff therefore meets his burden of establishing the insolvency element under § 547(b)(3), unless Defendant is able to rebut the presumption of insolvency. To rebut that presumption, Defendant must present some evidence of solvency that is more than speculative. As courts have noted:

> ■ [T]he presumption of insolvency may be rebutted by the introduction of "some evidence to show that the debtor was solvent *at the time of the transfer[.]*" *Gasmark Ltd. Liquidating Trust v. Louis Dreyfus Nat'l Gas Corp.*, 158 F.3d 312, 315 (5th Cir. 1998) (emphasis in original). "If the creditor introduces such evidence, then the trustee must satisfy its burden of proof of insolvency by a preponderance of the evidence." *Roblin Indus., Inc.*, 78 F.3d at 34. In order to rebut the statutory presumption of insolvency, "mere speculative evidence of solvency is not enough." *Gasmark Ltd. Liquidating Trust*, 158 F.3d at 315.

*Lingham Rawlings, LLC v. Gaudiano (In re Lingham Rawlings, LLC)*, Adv. No. 10–3125, 2013 WL 1352320, at *16 (Bankr. E.D.Tenn. Apr. 3, 2013) (italics in original).

Defendant has presented some evidence in an effort to rebut the presumption of insolvency, but the evidence is insufficient to do so. The only evidence presented is two specific balance sheets, dated as of June 30, 2011 and September 30, 2011. According to Defendant, these balance sheets show that as of these dates, "ECD's assets exceeded its liabilities." [30]

■ There are several reasons why these balance sheets are insufficient to rebut the presumption of insolvency. First and foremost, the balance sheets are dated well before the 90–day preference period, which began on November 16, 2011, and even longer before the date of the transfer at issue, December 9, 2011. As such, they do not constitute evidence that the Debtor ECD was solvent as of the transfer date. So they do not rebut the presumption of insolvency. *See, e.g., In re Florence Tanners, Inc.*, 209 B.R. 439, 447 n. 10 (Bankr. E.D.Mich.1997), *aff'd in part, vacated in part on other grounds sub nom, Halbert v. Yousif*, 225 B.R. 336 (E.D.Mich.1998) (debtor's financial statement "dated four months before the beginning of the preference period . . . may not by itself be sufficient to rebut the presumption of insolvency during the preference period under 11 U.S.C. § 547(f)"). Second, the balance sheets are consolidated balance sheets of the Debtor ECD and its subsidiaries, rather than balance sheets of ECD alone. Third, many of the assets shown on the balance sheets reflect the book value of assets rather than their market value. As the court in *Lingham Rawlings* noted,

> ■ "'[I]nsolvency is measured with reference to the 'fair market price of the debtor's assets that could be ob-

---

**30.** Def.'s Br. (Docket # 33) at 17 (citing ECD's Form 10–K filed on August 25, 2011 at 46 and ECD's Form 10–Q filed on November 14, 2011 at 2, attached to the Defendant's Brief (Docket # 33, Ex. Q)).

tained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts.'" *Cellmark Paper, Inc. v. Ames Merch. Corp. (In re Ames Dep't Stores, Inc.)*, 470 B.R. 280, 283 (S.D.N.Y.2012) (quoting *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 35 (2d Cir. 1996)).

2013 WL 1352320, at \*16; *see also In re Florence Tanners, Inc.*, 209 B.R. at 447 n. 10 (debtor's financial statements "state a value for [the debtor's] assets on a cost basis, not on a 'fair valuation' basis, as required by the definition of 'insolvency' under 11 U.S.C. § 101(32)(A).").

For these reasons, Defendant has not rebutted the presumption of insolvency. So Plaintiff must be deemed to have established that the December 2011 Transfer was made while the Debtor ECD was insolvent.

### 2. The "more than" element under § 547(b)(5)

#### a. The "more than" test

The parties dispute whether Plaintiff satisfies the requirement under § 547(b)(5), that Plaintiff prove that the December 2011 Transfer to Defendant

> (5) ... enables such creditor to receive more than such creditor would receive if—
>
> > (A) the case were a case under chapter 7 of this title;
> >
> > (B) the transfer had not been made; and
> >
> > (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b)(5). This Court discussed this element in detail in *Shapiro v. Art Leather, Inc. (In re Connolly North America, LLC)*, 398 B.R. 564 (Bankr.

E.D.Mich.2008). The Court began by noting the following:

> This element, referred to by the Sixth Circuit as the "'more than' test," "require[s] the bankruptcy court to construct a 'hypothetical Chapter 7 case,' i.e., to determine what the creditor would have received in a liquidation." *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.)*, 930 F.2d 458, 461 n. 1, 464 (6th Cir.1991). The test requires the Court to determine what distribution would be made in such a hypothetical Chapter 7 liquidation to the creditor who received the challenged transfer (or the creditor for whose benefit the transfer was made), assuming that the transfer had not been made. In a case such as this, where the transferee of the transfer (GE Capital), and the alleged transfer beneficiary (Art Leather), are both non-priority, unsecured creditors of the Debtor, the following rule applies:
>
> > Unless the estate is sufficient to provide a 100% distribution, any unsecured creditor ... who receives a payment during the preference period is in a position to receive more than it would have received under a Chapter 7 liquidation.

*Id.* at 465 (citation omitted).

In this case, then, the Trustee bears the burden of proving that the non-priority unsecured creditors in the hypothetical Chapter 7 liquidation case would receive less than a 100% distribution. Of course, that is what happens in the vast majority of bankruptcy cases, for "[a]n unsecured creditor's claim against a bankrupt debtor will rarely be worth one hundred cents on the dollar." *T.B. Westex Foods, Inc. v. Federal Deposit Insurance Corp. (In re T.B. Westex*

*Foods, Inc.),* 950 F.2d 1187, 1192 (5th Cir.1992). But that is not always so, and where, as here, the defendant does not concede the § 547(b)(5) element, the Trustee must prove it.

398 B.R. at 571.

As the quotation above from the *Art Leather* case indicates, *generally,* the following rule applies when the transferee of the alleged preferential transfer would be a non-priority, unsecured creditor in the hypothetical Chapter 7 case: to meet the "more than test" the Plaintiff only need prove that in the hypothetical Chapter 7 case the non-priority unsecured creditors would receive less than a 100% distribution. That is the holding of the Sixth Circuit in the *Chattanooga Wholesale Antiques* case, quoted in the *Art Leather* case above.

But this general rule does not apply in this case, as the following discussion will show.

### b. The parties' competing positions

In this case, there is no doubt or dispute that if the December 7, 2011 Transfer had not been made, Defendant's claim in a hypothetical Chapter 7 case would be a non-priority, unsecured claim. And in this case, the parties each assume, and agree, that such claim would have received a distribution of far less than 100%—namely, the parties agree that the distribution rate would have been between 50.1% and 59.3%.[31] And at oral argument, Defendant's counsel argued that the distribution rate to use is 56%, because that is what the Debtors' confirmed liquidation plan is actually paying in the ECD and USO jointly-administered Chapter 11 cases.[32] At

oral argument, Defendant's counsel argued as follows:

THE COURT: So that would have been the allowed amount of the claim in this bankruptcy.

[DEFENDANT'S COUNSEL]: Yes.

THE COURT: And from there you applied the percentage distribution in the—that's actually occurring in the Chapter 11 liquidation—under the liquidating plan in the Chapter 11 case that was actually filed later?

[DEFENDANT'S COUNSEL]: Right. And—and that—those ranges that are in the disclosure statement, we—we use that analysis. Now as a matter of fact we know better. We have an actual percentage.

That it's 56% as of this date....

THE COURT: Well, this 56% distribution, where does that come from? That's just—you're telling me that's whats—that's what out there happening right now.

[DEFENDANT'S COUNSEL]: It's from representing other clients who have received payments and I believe it's in the—the trustee's periodic reports that are filed with the Court.

...

THE COURT: Your analysis of the more than test, and perhaps both sides do this in discussing that test, uses the dividend percentage actually achieved or at least actually achieved as of now roughly or as contemplated in the disclosure statement in the Chapter 11 case that was actually filed being in February 2012, and of course that amount depends on all the events that occurred in the Chapter 11 case

---

**31.** On this, the parties agreed. *See* Pl.'s Br. (Docket # 36, Ex. 3) at 7; Def.'s Br. (Docket # 33) at 9; Pl.'s Resp. Br. (Docket # 41) at 5; Def.'s Resp. Br. (Docket # 40) at 3.

**32.** Tr. (Docket # 69) at 70, 75–76.

and that have occurred to date that—enabling the trustee to make those sorts of—those distributions at that level.

Is—is that the—the proper reference for the Court to use as—to determine what the distribution ·or the dividend rate would have been in the hypothetical Chapter 7 filed in December 2011 for purposes of the more than test?

[DEFENDANT'S COUNSEL]: It's the best evidence we have, Your Honor. I think that's why both parties refer to it.[33]

Although the parties agree on this basic assumption—that the distribution rate for non-priority unsecured creditors in the hypothetical Chapter 7 case would be far less than 100%—from that point the parties diverge, and make competing arguments about how the "more than" test works in this case. The debate between the parties primarily has to do with their disagreements about the following two issues: (1) whether, in calculating the allowed claim that Defendant would have had in the hypothetical Chapter 7 case, the claim would be subject to the cap in 11 U.S.C. § 502(b)(7); and (2) if the § 502(b)(7) cap would apply, what claim amount would result. The Court will describe the parties' competing positions on these issues, and then explain the Court's ruling.

Section 502(b)(7) applies to "the claim of an employee for damages resulting from the termination of an employment contract," and it requires disallowance of such claim to the extent the claim exceeds the following:

(A) the compensation provided by such contract, without acceleration, for one year following the earlier of—

(i) the date of the filing of the petition; or

(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

(B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates[.]

11 U.S.C. § 502(b)(7).

Plaintiff argues that if the December 2011 Transfer had not been made, Defendant would have had a claim in the hypothetical Chapter 7 case, but such claim would have been subject to the § 502(b)(7) cap. Defendant argues that § 502(b)(7) would not have applied to such a claim, because it would not have been a "claim of an employee for damages resulting from the termination of an employment contract," within the meaning of § 502(b)(7).

Defendant also argues that even if the § 502(b)(7) cap would apply to his claim in the hypothetical Chapter 7 case, such cap amount would be higher than his claim. Defendant calculates that the cap amount would be $2,074,649. But Defendant says that his claim amount would be less than this cap amount—namely, the claim amount would be $1,415,978.[34] Defendant's calculation of this claim amount assumes that if the December 2011 Transfer had not been made, Defendant's claim would not have been limited to the $703,800 compromise amount due under the December 6, 2011 Settlement Agreement. Rather, Defendant says that his claim would be for the full amount still owing to him under the May 6, 2011 Separation Agreement, which Defendant says

---

33. *Id.* at 70–71, 75.

34. *See* Def.'s Br. in Supp. of Mot. for Summ. J. (Docket # 33) at 8–9.

was $1,415,978. This assumption is discussed below.

Working from this $1,415,978 claim amount that Defendant says would be his allowed claim in the hypothetical Chapter 7 case, Defendant's argument about the "more than" test continues with the following reasoning:

> In the Debtor's case, the Trust is making distributions to unsecured creditors of approximately 50.1% to 59.3% of their claims. If Mr. Morelli would have filed his chapter 7 claim pursuant to the Separation Agreement, at the low end he would have received $709,405 on his claim and $839,675 on the high end. Pursuant to the Settlement Agreement, Mr. Morelli received $703,800. Therefore, Mr. Morelli received less than he would in a hypothetical chapter 7 case. As a result, the Trustee cannot prove the requisite elements of a preference under the Bankruptcy Code.[35]

Plaintiff, on the other hand, argues that the § 502(b)(7) cap would have applied. In his initial summary judgment brief, Plaintiff argued that the cap would have limited Defendant's allowed claim in the hypothetical Chapter 7 case to no more than $499,242 (far lower than the $2,074,649 amount Defendant calculates the cap to be).[36] Using that cap number, Plaintiff argued as follows:

> If Mr. Morelli had not received the December 2011 [Transfer] and had instead filed a claim in the Debtors' bankruptcy, he ... would have received a claim representing one year's salary ($485,000) plus the value of one year's medical and incidental benefits

(estimated by Defendant to total approximately $14,242), totaling approximately $499,242. As a matter of law, this claim would then have been subject to a distribution between 50.1% and 59.3%, leaving Defendant with an actual payment of ranging from $250,120 to as high as $296,051. Instead, Defendant received the December 2011 Transfer in excess of $700,000. Therefore, Plaintiff has demonstrated that Defendant received more than he would have received had the case resulted in a chapter 7 liquidation and had he filed a proof of claim based on the amount purportedly remaining under the Separation Agreement.[37]

In a later summary judgment brief, however, Plaintiff conceded that the § 502(b)(7) cap would be higher than $499,242—instead, Plaintiff conceded that the cap would be $682,627.[38] And Plaintiff's counsel reiterated this latter position in oral argument at the hearing.[39] Using this higher cap number, Plaintiff argued it this way:

> Defendant's hypothetical chapter 7 claim would be subject to the section 502(b)(7) cap as follows: (1) Defendant's one-year salary of $485,000, plus (2) the value of one-year's benefits, as estimated by Defendant to be approximately $14,242, plus (3) pro rata bonus, less payments made, of $183,385, which totals approximately $682,627. Defendant's hypothetical chapter 7 claim of approximately $682,627 would have been paid somewhere between $341,996 to as high as $404,798, assuming the distribution

---

35. *Id.* at 9 (record citation omitted).

36. *See* Pl.'s Br. (Docket # 36, Ex. 3) at 5–6.

37. *Id.* at 7–8 (footnotes omitted).

38. *See* Pl's. Br. (Docket # 41) at 5.

39. Tr. (Docket # 69) at 9–10.

payout to unsecured creditors ranging from 50.1% to 59.3%.

At best, therefore, the hypothetical chapter 7 payment that Defendant would have received, totaling approximately $400,000, is substantially less than the actual December 2011 Transfer, which exceeded $700,000.[40]

### c. Steps in the Court's ruling regarding the "more than" test

### i. Defendant's claim in the hypothetical Chapter 7 case would be $1,415,978 (subject to possible application of the § 502(b)(7) cap), rather than the $703,800 compromise amount in the December 2011 Settlement Agreement.

As noted above, Defendant's view is that if the December 2011 Transfer had not been made, Defendant's claim in the hypothetical Chapter 7 case would not have been limited to the $703,800 compromise amount due under the December 6, 2011 Settlement Agreement, but rather Defendant's claim would be for the full amount still owing to Defendant under the May 6, 2011 Separation Agreement, which Defendant says was $1,415,978.

Plaintiff does not dispute this, except to argue that the § 502(b)(7) cap would apply to limit Defendant's claim. Rather, Plaintiff agrees that Defendant's claim in the hypothetical Chapter 7 case would be the roughly $1.4 million amount, subject to the cap.[41]

Defendant's position is based on his view that his agreement in the December 2011 Settlement Agreement, to accept a lower amount ($703,800) than what was then due him under the Separation Agreement ($1,415,978), was contingent upon ECD actually paying Defendant the $703,800 amount.[42] Thus, if one assumes that the December 2011 Transfer (the $703,800 payment) had not been made, as we must for purposes of the "more than" test, then the entire $1.4 million debt owing by ECD to Defendant under the Separation Agreement would still be due.

The Court agrees with Defendant's undisputed interpretation of the Settlement Agreement on this point, based on the unambiguous language of that agreement,[43] including the language in ¶ 2 of that agreement, stating that ECD would have no further payment obligations under the Separation Agreement "[u]pon payment of the [$703,800] lump sum amount[.]"[44]

The Court finds, therefore, that Defendant's $1,415,978 claim amount,[45] is correct, subject to possible application of the § 502(b)(7) cap, discussed below.

**40.** Pl's. Br. (Docket # 41) at 5 (footnotes omitted).

**41.** *See* Pl's. Br. (Docket # 36, Ex. 3) at 5–6; Tr. (Docket # 69) at 8, 87 ln. 20 through 88 ln. 2.

**42.** *See* Tr. (Docket # 69) at 68–70.

**43.** *See* Settlement Agreement (Docket # 33, Ex. G) at ¶¶ 1–3.

**44.** *Id.* at ¶ 2.

**45.** For a calculation of this amount, *see* Expert Report of James M. Lukenda (Docket # 34, Ex. H) at 29; Separation Agreement (Docket # 33, Ex. E) at Schedule A. Plaintiff filed a motion to strike the report of Defendant's expert, Mr. Lukenda (Docket # 49), and the Court has not yet ruled on that motion. But that motion to strike does not make any argument that would make inadmissible the portion of Mr. Lukenda's expert report (and expected trial testimony) regarding what the amount of Defendant's claim would be in *the hypothetical Chapter 7 case, before possible application of the § 502(b)(7) cap. See* Pl.'s Mot. to Strike, etc. (Docket # 49); Pl.'s Mem. in Supp. of Mot. (Docket # 49, Ex. 3).

**ii. Plaintiff is correct that Defendant's claim in the hypothetical Chapter 7 case would be subject to the § 502(b)(7) cap.**

As discussed above, Defendant's claim in the hypothetical Chapter 7 case would be for sums still due him under the May 6, 2011 Separation Agreement. And as discussed in Part II.A.2 of this opinion, the Separation Agreement was expressly intended by the parties "to implement" the pre-existing Executive Severance Plan, with certain modifications. Under the Executive Severance Plan, Defendant was entitled to certain severance-related benefits due to the termination of his employment by ECD. Defendant's entitlement to severance benefits under the Executive Severance Plan clearly was among the terms of Defendant's employment with ECD, and was part of his employment contract with ECD. For these reasons, Defendant's claim for the sums due to him under the Separation Agreement simply would be a somewhat modified claim under his employment contract, resulting from the termination of Defendant's employment. As such, it would be a "claim ... for damages resulting from the termination of an employment contract" within the meaning of § 502(b)(7).

In similar situations, courts have routinely held that the § 502(b)(7) cap applied to a claim for severance benefits. *See, e.g., In re VeraSun Energy Corp.*, 467 B.R. 757, 763–67 (Bankr.D.Del.2012); *Protarga, Inc. v. Webb (In re Protarga, Inc.)*, 329 B.R. 451, 465–66 (Bankr.D.Del.2005); *In re Uly–Pak, Inc.*, 128 B.R. 763, 769 (Bankr. S.D.Ill.1991); *In re Cincinnati Cordage & Paper Co.*, 271 B.R. 264, 269 (Bankr. S.D.Ohio 2001).

Defendant argues that the Separation Agreement "displaced" Defendant's employment contract, with respect to severance benefits, and was "a separately bargained for contract and compromise" by the parties from Defendant's employment agreement.[46] As a result, Defendant argues, the Separation Agreement was not itself an "employment contract," and a claim under that contract therefore would not be subject to the § 502(b) cap.

But Defendant has cited no authority that supports his argument, and the Court must reject it. The Separation Agreement modified (in limited ways) and implemented the severance benefit portions of Defendant's employment contract. That employment contract was terminated due to the termination of Defendant's employment with ECD, but the severance benefit provisions of that contract, by their nature, survived the termination. Such severance benefit provisions in an employment contract, by their nature, survive the termination of the employee's employment, and usually are triggered only by the termination of employment. Because the Separation Agreement basically implemented the surviving severance benefit portions of Defendant's terminated employment contract, any claim by Defendant for ECD's failure to pay amounts due under the Separation Agreement would be a "claim for damages resulting from the termination of an employment contract." Thus, the § 502(b) cap would apply to such a claim.

As the court in *VeraSun Energy Corp.* pointed out,

> Courts considering the policy behind § 502(b)(7) have said that the section "was designed to limit the claims of key executives who had been able to negotiate contracts with very beneficial terms." *Protarga Inc. v. Webb (In re Protarga Inc.)*, 329 B.R. 451, 465 (Bankr.D.Del.2005) (quoting *In re*

46. Tr. (Docket # 69) at 63–65.

*Cincinnati Cordage & Paper, Co.,* 271 B.R. 264, 269 (Bankr.S.D.Ohio 2001)); *accord In re CPT Corp.,* No. 4–90–5759, 1991 WL 255679, at *5 (Bankr. D.Minn. Nov. 26, 1991) ("[S]ection 502(b)(7) was intended to protect the estate from the burdensome claims of key executive employees who were able to exact high salaries and favorable terms in their employment contracts."). It should thus come as no surprise that senior executives' claims for severance pay, which is "money— apart from back wages or salary— paid by an employer to a dismissed employee," have been capped by § 502(b)(7). *Black's Law Dictionary* 1498 (9th ed.2009) (defining "severance pay" and noting that severance "may be made in exchange for a release of any claims that the employee might have against the employer"). Unlike wages that are paid for services rendered, severance is meant "as compensation for the injury and losses resulting from the employer's decision to terminate the employment relationship." *Matson v. Alarcon,* 651 F.3d 404, 409 (4th Cir.2011) (discussing severance pay under § 507 of the Bankruptcy Code); *see Harrington v. Dornier Aviation, Inc. (In re Dornier Aviation, Inc.,)* 305 B.R. 650, 654 (E.D.Va.2004) (discussing policy behind cap and observing it "clearly limits an employee's claim for severance pay, as this is in effect a claim for prospective compensation that is accelerated as a result of the termination."). Because both the amount of severance employees receive and "the triggering events allowing [them] to receive [it] lie within the employer's control," *Matson,* 651 F.3d at 409,

senior executives are particularly well-positioned to provide themselves with generous severance packages. They therefore enjoy a distinct advantage over other unsecured creditors, including other employees, who cannot easily adjust their claims to the company's assets. Congress enacted § 502(b)(7) in part to limit the effect of that advantage if the company files for bankruptcy.

467 B.R. at 765–66.

### iii. The amount of the § 502(b)(7) cap in the hypothetical Chapter 7 case cannot be determined at this summary judgment stage.

■ As noted in Part IV.D.2.b of this opinion, the parties dispute what the amount of the § 502(b)(7) cap would be as to Defendant's claim in the hypothetical Chapter 7 case. Defendant says that the cap amount would be $2,074,649, an amount much greater than Defendant's $1,415,978 claim amount in the hypothetical Chapter 7 case.

Plaintiff, on the other hand, argues that the cap amount would be no more than $682,627.

The Court cannot resolve this dispute at this point. Rather, the Court concludes that it cannot determine, at this summary judgment stage and on the present record, what the cap amount would be for Defendant's claim in the hypothetical Chapter 7 case. A trial will be necessary on this issue.

Defendant's claimed cap amount of $2,074,649 is calculated by Defendant's expert James M. Lukenda as consisting of the following components:

## Claim Cap under Section 502(b)(7)

(A) Pro forma compensation per the Employment Agreement
May 6, 2011 through May 5, 2012

| | | |
|---|---|---|
| Salary | | $ 485,000 |
| Management Incentive Plan | Target 85% | 412,250 |
| Long Term Incentive Plan | Target 200% | 970,000 |
| Benefits | | |
|     Employer portion of health care benefits | | 14,242 |
|     401(k) match | | 9,800 |
| **Total due under employment agreement** | | **$ 1,891,292** |

(B) Compensation due at termination, May 6, 2011

| | |
|---|---|
| Pro rata bonus earned | 343,542 |
| Payments made against bonus | (160,185) |
| **Net due at termination** | **$ 183,357** |
| **Total claim cap**    not less than | **$ 2,074,649**[47] |

Plaintiff disputes at least two of these components of Mr. Lukenda's calculation. Plaintiff argues that the "Management Incentive Plan" amount of $412,250 and the "Long Term Incentive Plan" amount of $970,000 should not be included. Plaintiff argues that during the relevant one-year period (May 6, 2011 through May 5, 2012), Defendant would not have been entitled to these amounts as part of his compensation. Plaintiff argues that these are bonuses that Defendant would not have been eligible for or been paid during that one-year period, if his employment had continued. As a result, Plaintiff argues, these amounts (which total $1,382,250) should be subtracted from Defendant's $2,074,649 cap amount. That would reduce Defendant's cap amount to $692,399.[48]

This disputed issue matters because if Defendant's cap amount is correct, then Plaintiff cannot prove the "more than" element of his preference case against Defendant. But if Plaintiff's cap amount is correct, then Plaintiff would prove the "more than" element.

47. Expert Report of James M. Lukenda (Docket # 34, Ex. H) at 28, Chart 2 (bold in original).

48. In their briefs and oral arguments, the parties have not discussed the $9,800 "401(k) match" component of Mr. Lukenda's cap calculation. Given the Court's ruling on the much larger bonus components, it is not necessary for the Court to discuss this $9,800 component in this opinion.

The issue with respect to these two bonus items in Defendant's cap calculation, under § 502(b)(7), is whether Defendant would have been contractually entitled to these bonus amounts, as "compensation provided by" his employment contract, during the one year period beginning on his termination date (May 6, 2011), if Defendant's employment with ECD had continued. Plaintiff says no. Defendant says yes.

Defendant's position on this issue is not supported by any evidence or other material in the present record that the Court may consider under Fed. R. Civ.P. 56(c).[49] While Defendant's expert James Lukenda's report lists these two bonus items as components in his § 502(b)(7) cap calculation, his report presents no evidence that Defendant would in fact have been *contractually entitled* to these bonus amounts during the relevant one-year period, if his employment had continued. Nor has Defendant pointed to any other such evidence in the record.

Plaintiff's position on this bonus issue likewise is not supported by any evidence or other Civil Rule 56(c) material in the record that the Court may consider.

Plaintiff's counsel, in substance, acknowledged as much in oral argument during the hearing, as discussed below.

Plaintiff argues two grounds for concluding that Defendant would not have been entitled to the bonuses at issue. First, during oral argument, Plaintiff argued that in the months after Defendant's termination in May 2011, ECD "was in severe financial distress with substantial operating losses" and "did not meet the targets for paying [the] bonuses [at issue]."[50] Because of the company's poor financial performance, Plaintiff says, "in the third quarter of 2011, the board of directors reported that the objectives under the company's AIP were not—the threshold metrics were not achieved and there was no pay out."[51] As a result, Plaintiff says, Defendant would not have been contractually entitled to either of the bonuses at issue during the one-year period of May 2011 to May 2012.

But Plaintiff's counsel admitted during oral argument that the key facts described above—that ECD did not meet the necessary performance targets that would have entitled Defendant to a bonus during the relevant time period, and that ECD's Board of Directors so declared in the third

---

**49.** Fed. R. Civ. P. 56(c) provides:

  **(c) Procedures.**

    **(1)** *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

    **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

    **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

    **(2)** *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

    **(3)** *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

    **(4)** *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

(bold in original).

**50.** Tr. (Docket # 69) at 9.

**51.** *Id.* at 11.

quarter of 2011—are not supported by any evidence in the present record of this case.[52]

Plaintiff's second ground presented in support of its no-bonus argument is that during the early, pre-confirmation stage of ECD's Chapter 11 case, ECD proposed and the Court approved a voluntary program under which non-insider employees who were terminated post-petition could agree to receive a lump-sum payment in compromise of their severance claims. Under this program, Plaintiff says, such employees received no bonuses. The Court approved that program, which was called the "Revised Severance Compromise Program," in an order entered in the main bankruptcy case on April 3, 2012.[53] In addition, in the Debtor ECD's motion for approval of this program, ECD described a pre-petition severance compromise program that it had implemented, as follows:

> The Severance Compromise Program is a continuation of a program adopted by the Debtors before the Petition Date. In November 2011, to encourage the efficient and equitable reduction of their workforce, the Debtors provided employees who were being terminated the ability to accept a lump-sum payment of a discounted percentage of the amounts to which they were entitled under the Debtors' existing severance plans. In exchange for the payment, each participating employee executed a release of all claims held by the employee against the Debtors. Approximately 71 employees entered into agreements compromising their severance claims

pursuant to this program before the Petition Date and yielding approximately $511,933 of savings. Moreover, pre-petition the Debtors similarly compromised severance claims for previously terminated employees. Those employees who had already been terminated and were collecting severance agreed to receive a discounted percentage of the remaining severance obligation in exchange for a full release of claims against the Debtors. The Debtors realized savings of $1,230,637 arising from the severance compromise.[54]

But the Revised Severance Compromise Program approved by the Court, like the similar pre-petition program adopted by ECD, was a voluntary program, in which a terminated employee could choose to accept a lump-sum payment of a compromise severance payment amount, in exchange for giving a release of any claim to a higher severance claim amount. A terminated employee did not have to participate in these compromise programs, and did not have to give such a release. The existence of these voluntary severance compromise programs sheds no light on what Defendant would have been contractually entitled to in the way of bonuses, if he had remained employed by ECD rather than being terminated in May 2011, and if he had not agreed to a compromise of claims against ECD under his employment contract. And in approving the Revised Severance Compromise Program in ECD's bankruptcy case, the Court made no findings that bear on this issue.

For these reasons, the Court concludes that on the present record, Plaintiff has

---

**52.** *See id.* at 12–15.

**53.** Docket # 312 in Case No. 12–43166; *see also* Docket ## 76, 309 in Case No. 12–43166 (the motion for approval of the program, and

the Debtor's modification of the proposed program before it was approved).

**54.** Docket # 76 in Case No. 12–43166 at 10, ¶ 27.

not presented any evidence, or other material the Court may consider under Fed. R. Civ. P. 56(c), that Defendant would not have been contractually entitled to any bonuses if he had remained employed by ECD for the year after May 6, 2011.

In summary, on the key question regarding the § 502(b)(7) cap—namely, whether Defendant would have been *contractually entitled* to the bonuses at issue, and if so, in what amount(s)—neither party has presented any evidence yet that would enable the Court to answer the question.

### d. The Court's conclusion regarding the "more than" test

For these reasons, a genuine issue of material fact remains regarding whether Plaintiff can meet his burden of proving the "more than" element of his preference claim under § 547(b)(5). Because of this, neither party is entitled to summary judgment on Plaintiff's claim to avoid and recover the December 2011 Transfer.

### 3. Defendant's affirmative defenses under 11 U.S.C. §§ 547(c)(1) (contemporaneous new value) and 547(c)(2)(ordinary course of business)

Defendant argues that the December 2011 Transfer is not avoidable as a preference based on defenses under 11 U.S.C. §§ 547(c)(1) and 547(c)(2). On these defenses, Defendant bears the burden of proof. *See* 11 U.S.C. § 547(g). The Court disagrees with Defendant, and concludes that Plaintiff is entitled to a summary judgment ruling that these affirmative defenses are not available, as a matter of law.

### i. Section 547(c)(1)

Section 547(c)(1), the contemporaneous new value defense to preference avoidance, states:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange[.]

11 U.S.C. § 547(c)(1).

Defendant argues that under the December 6, 2011 Settlement Agreement, he gave "new value" to ECD in exchange for the $703,800 transfer made to him on December 9, 2011; that the value of that "new value" exceeded the amount of the December 2011 Transfer; and that the exchange was substantially contemporaneous. The "new value" that Defendant claims to have given is primarily his release of ECD's remaining debt to him under the May 2011 Separation Agreement. As discussed above, Defendant says that before the December 2011 Transfer was made, ECD still owed him $1,415,978 under the Separation Agreement. Defendant agreed to accept payment of $703,800 and release the rest of his claim. The released portion of ECD's debt therefore amounted to $712,178. Defendant says he also waived his right to certain medical insurance. And Defendant says he promised to comply with the covenants and releases he had given previously, in the May 2011 Separation Agreement. Defendant further argues that the value he gave in exchange for the December 2011 Transfer benefitted ECD, which was then pursuing possible restructuring alternatives short of bankruptcy and a bankruptcy liquidation.

The Court must reject Defendant's contemporanous new value defense as a matter of law, for the following reasons.

First, to the extent Defendant agreed in the December 6, 2011 Settlement Agreement merely to comply with the covenants and releases he had already given to ECD in the May 2011 Separation Agreement, there is nothing "new" about that alleged value. And in fact such promises to comply with already-existing contractual obligations is not "value" at all. It gave ECD nothing new of value—nothing that ECD did not already have.

Second, Defendant's release of part of his claim against ECD under the May 2011 Separation Agreement was not "new value" as that concept is defined by the Bankruptcy Code and the case law. Defendant agreed to accept a lump sum payment of roughly half the total amount he was owed under the May 2011 Separation Agreement, which included severance benefits and medical benefits, in exchange for a release of the rest of his claim against ECD. That release is not "new value."

The phrase "new value," as used in § 547, is defined in § 547(a)(2), which provides:

(a) In this section—

. . .

(2) "new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation[.]

11 U.S.C. § 547(c)(2).

Defendant's release of claims against ECD was not "money or money's worth in goods, service, or new credit," within the meaning of the § 547(c)(2) definition. Defendant's release did not give ECD any "goods, services, or new credit," even if it could be characterized as "money or money's worth."

Nor does Defendant's release of claims against ECD meet the other part of the § 547(c)(2) definition—it was not a "release by a transferee of property previously transferred to such transferee. . . ." During oral argument, Defendant's counsel argued that Defendant's contract rights under the May 2011 Separation Agreement were "property," that such contract rights had previously been "transferred" to Defendant by ECD in the May 2011 Separation Agreement, and that in giving his release of claims in the December 2011 Settlement Agreement, Defendant released such contract rights.[55] The Court disagrees with this argument. While Defendant's contract rights under the May 2011 Separation Agreement might be viewed as "property," they were not "previously transferred" to Defendant by ECD in the Separation Agreement. Rather, such contract rights were *created* by the Separation Agreement. Such contract rights were not pre-existing rights that ECD owned, and then "transferred" to Defendant. So this part of the § 547(c)(2) definition of "new value" does not apply. *See Energy Coop., Inc. v. SOCAP Int'l, Ltd. (In re Energy Coop., Inc.)*, 832 F.2d 997, 1003 (7th Cir.1987) (creditor's release of breach of contract claim against debtor, in exchange for agreed payment by debtor, is not "new value," because it is not "money or money's worth in goods, services or new credit," or "a transfer of property to [the debtor] that [the debtor] had previously transferred to [the creditor]").

For these reasons, Defendant gave no "new value" to ECD in exchange for the December 2011 Transfer, and Defendant

---

**55.** *See* Tr. (Docket # 69) at 80–81.

has no defense to avoidance under § 547(c)(1). Case law under § 547(c)(1) confirms this conclusion, by holding that a creditor's release of a claim against a debtor in exchange for a partial payment does not constitute "new value," particularly when the payment and release occur at a time when the debtor is insolvent (as ECD is presumed to have been when the December 2011 Transfer was made, as discussed in Part IV.D.1 of this opinion.) *See Energy Coop.*, 832 F.2d at 1003–04; *see also Weinman v. Walker (In re Adam Aircraft Indus., Inc.)*, 493 B.R. 834, 848–49 (Bankr.D.Colo.2013) (citations omitted) ("new value" requires something "of tangible economic value," that "actually and in real terms enhance[s] the worth of debtor's estate so as to offset the reduction in the estate the transfer caused"). As the Seventh Circuit Court of Appeals explained:

> [The creditor] argues that in exchange for its payment, [the debtor] received a release from its contract obligations and continued "credibility and goodwill with [the creditor] and in the international crude oil marketplace." [The creditor] does not (and cannot) argue that this "new value" is "money or money's worth in goods, services or new credit," or a transfer of property to [the debtor] that [the debtor] had previously transferred to [the creditor]. In fact, [the creditor] concedes that [the debtor] did not receive goods, services, or money. We agree with the trustee that the release and goodwill do not fall within § 547(a)(2)'s definition of new value. To hold otherwise would be inconsistent with the contemporaneous exchange exception's purpose. We refuse to stretch § 547(a)(2)'s language beyond Congress' clear intent.
>
> The contemporaneous exchange exception exists to protect "transfer[s]

that [are] not really on account of an antecedent debt." House Report at 373, 1978 U.S.Code Cong. & Ad.News at 6329. That exception does not fit here. [The debtor] paid [the creditor] $1.6 million to settle a breach of contract claim that arose more than a month before [the debtor] paid [the creditor]; in other words, [the debtor] paid off an antecedent debt. [The creditor]'s release (or the "goodwill") makes no difference. If a release (and possible "goodwill") resulting from settling a claim was new value bringing the settlement payment within the contemporaneous exchange exception, creditors would rush to settle for cash at the first hint of the debtor's financial trouble rather than wait and pursue a claim in bankruptcy. Those creditors who successfully settle will likely receive more than they otherwise would have, leaving less for the creditors who do not successfully settle. This would be inconsistent with Congress' intent to deter creditors from dismembering the debtor during his slide into bankruptcy and to promote equity among creditors. *See* House Report at 178–79, 1978 U.S.Code Cong. & Ad.News at 6138, 6139. Congress certainly did not intend the contemporaneous exchange exception to achieve such a result.

Furthermore, a payment is not a preference unless the debtor is insolvent and the creditor receives more than he would have otherwise received. *See* 11 U.S.C. § 547(b)(3) & (5). Therefore, in a preference situation a release is likely to be worthless to other creditors. The release does not free up any assets for other creditors because the debtor could not have paid the preferred claim anyway. All the payment for the settle-

ment and release does is deplete the debtor's estate at the other creditors' expense, frustrating Congress' intent to promote fair distribution among creditors. Because the release and "goodwill" are not new value, the contemporaneous exchange exception does not apply to [the debtor]'s payment.

*Energy Coop.*, 832 F.2d at 1003–04.

For these reasons, the Court rules that Defendant has no defense under § 547(c)(1) to avoidance of the December 2011 Transfer.

### ii. Section 547(c)(2)

Section 547(c)(2), the ordinary course of business defense to avoidance of a preference, states:

> (c) The trustee may not avoid under this section a transfer—
>
> . . .
>
> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
>
> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>
> (B) made according to ordinary business terms[.]

11 U.S.C. § 547(c)(2).

The Sixth Circuit Court of Appeals has held that § 547(c)(2) "was intended to 'protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the Debtor and the transferee.'" *Waldschmidt v. Ranier (In re Fulghum Constr. Corp.)*, 872 F.2d 739, 743 (6th Cir.1989) (citation omitted). "Congress enacted § 547(c)(2) 'to leave undisturbed normal financial relations, because they do not detract from the general policy of the preference section to discourage unusual action by either the debtor or creditors during the debtor's slide into bankruptcy.'" *Id.* (citation omitted).

To meet his burden under § 547(c)(2), Defendant must prove both elements in this section, namely, (1) that the debt paid by the December 2011 Transfer was "incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;" *and* (2) that the December 2011 Transfer was *either* (A) "made in the ordinary course of business or financial affairs of the debtor and the transferee" or (B) "made according to ordinary business terms."

■ The first of these elements "'requires an examination of the debts incurred for which the transfers were payment for the normality of such incurrences in each party's business operations generally. If the debts were incurred in the routine operations of [the Debtor] and [the Creditor], then they can be said to have been incurred in the ordinary course of each party's business.'" *Speco Corp. v. Canton Drop Forge, Inc. (In re Speco Corp.)*, 218 B.R. 390, 398 (Bankr.S.D.Ohio 1998) (quoting *Youthland, Inc. v. Sunshine Girls of Florida, Inc. (In re Youthland, Inc.)*, 160 B.R. 311, 314 (Bankr.S.D.Ohio 1993)). If this element is not proven, the § 547(c)(2) defense fails. *See, e.g., Pioneer Tech., Inc. v. Eastwood (In re Pioneer Tech., Inc.)*, 107 B.R. 698, 702 (9th Cir. BAP 1988); *McCullough, II v. Garland (In re Jackson)*, 90 B.R. 793, 796–97 (Bankr.D.S.C.1988).

■ With respect to the first of these elements, neither Plaintiff nor Defendant has focused on whether the debt that was paid and settled by the December 2011 Transfer—*i.e.*, ECD's remaining debt to Defendant under the May 2011 Separation

Agreement—was incurred by ECD in the "ordinary course of business or financial affairs" of both ECD and Defendant. In their summary judgment briefs and in oral argument, neither party has argued explicitly about this element, and neither party has pointed to evidence in the record that would support or negate this element. The parties each may assume, or agree, that this § 547(c)(2) element is met, but if so, that is not sufficiently clear on the present record. If this were the only issue under § 547(c)(2) presented by the summary judgment motions, the Court could not grant summary judgment for either Plaintiff or Defendant regarding the § 547(c)(2) defense.

The parties focus their summary judgment arguments on the second § 547(c)(2) element. Plaintiff argues that the December 2011 Transfer was neither "made in the ordinary course of business or financial affairs" of ECD and Defendant, nor "made according to ordinary business terms." Defendant argues the opposite. The Court concludes that Plaintiff is correct, for the following reasons.

First, the December 2011 Transfer and the Settlement Agreement under which the transfer was made did not constitute the type of transaction § 547(c)(2) was intended to cover, because the transaction was not a "recurring, customary credit transaction which [was] incurred and paid in the ordinary course of business of [ECD] and [Defendant]." *Waldschmidt,* 872 F.2d at 743. Rather, Plaintiff is correct in characterizing the December 2011 Transfer this way:

> [T]he December 2011 Transfer was made under extraordinary circumstances: it was a one-time payment made pursuant to the Settlement Agreement negotiated between the

Debtors and their former CEO on the brink of bankruptcy, and as a result of a company's decision to "reduce their obligations." [56]

Second, the undisputed evidence presented by the parties refutes Defendant's attempt to prove the § 547(c)(2) defense. Defendant argues that his agreement in December 2011 to accept a compromise, one-time payment of roughly 50% of what he was then still owed by ECD under the May 2011 Separation Agreement, was ordinary and not unusual for ECD at the time. Defendant points to the fact that beginning in November 2011, with the help of its counsel and its retained financial turnaround experts, ECD was negotiating severance agreements with other ECD employees who had been terminated or were to be terminated, and that most of these other employees agreed to accept lump-sum severance payments with a discount in the range of 50–55%. Defendant also argues that other solar companies had made severance agreements with employees at a time after the employees had been terminated.

These facts are insufficient to create an issue of material fact, however, for the following reasons. First, the evidence is undisputed that Defendant's December 6, 2011 Settlement Agreement, and the negotiations leading up to it, were unique. They were different from the severance-related negotiations and agreements ECD negotiated and made with other employees, and they were "unusual." This is largely because unlike the other ECD employees and ex-employees, (A) Defendant was asked to accept, and did accept, a modification of a separation agreement made months before (the May 6, 2011 Separation Agreement), which had already fixed the amount and timing of Defen-

---

**56.** Pl's Br. (Docket # 36, Ex. 3) at 13.

dant's severance benefits; and (B) the compromise amount Defendant accepted, and was paid in the December 2011 Transfer, left Defendant with having received a total severance amount of roughly 64% of what he was entitled to under the May 2011 Separation Agreement,[57] compared with the other employees who received only 50–55% of the severance pay they were entitled to.

The undisputed testimony of Edward J. Stenger, Jr., the turnaround specialist retained by ECD and the person who negotiated the December 2011 Settlement Agreement with Defendant, shows that the December 2011 Settlement Agreement and the December 2011 Transfer were neither made in the ordinary course of business nor made according to ordinary business terms. Mr. Stenger testified that seeking and obtaining Defendant's agreement to modify his rights under a separation agreement that already existed (the May 2011 Separation Agreement) was "unusual:"

> Q. In this instance, Mr. Morelli had an employment agreement with the company; is that your understanding, originally?
>
> A. Yes.
>
> Q. Okay. And he was also covered by an executive severance plan, do you recall that document we shared with you?
>
> A. Yes.

> Q. Okay. And then he was terminated by the company and added into a separation agreement that is marked as Exhibit 5?
>
> A. Yes.
>
> Q. Okay. And then you approached him about modifying that agreement and the parties ultimately agreed to modify that agreement and that was memorialized in a settlement agreement; is that correct?
>
> A. Correct.
>
> Q. Okay. Which part of that arrangement in your experience is unusual?
>
> A. The unusual part is, usually, I'm not renegotiating people's termination agreements that already exist.
>
> Q. Okay.
>
> A. I'm negotiating the first termination agreement.
>
> Q. So, normally, if you were on board, you would have negotiated the separation agreement itself?
>
> A. Yes, the termination and separation agreement, exactly.[58]

Stenger also testified that ECD asked him to negotiate discounted severance agreements with other ECD employees; that involved around "six to ten" other employees; and the negotiations with those other employees did not involve renegotiation of

**57.** This percentage is calculated as follows: of the severance-related pay Defendant was entitled to under the May 2011 Separation Agreement, Defendant was paid $583,270 on or about May 27, 2011 (the May 2011 Transfer), plus $703,800 on December 9, 2011 (the December 2011 Transfer). Defendant was still owed $1,415,978 under the May 2011 Separation Agreement before the December 2011 Settlement Agreement and December 2011 Transfer were made. That amount, plus the $583,270 Defendant was paid in the May 2011 Transfer, equals $1,999,248, and this total represents what Defendant was due under the May 2011 Separation Agreement before any payments were made under that agreement. Thus, the total of the two payments Defendant received, $1,287,070, equals roughly 64% of the total Defendant was entitled to under the May 2011 Separation Agreement.

**58.** Tr. of Stenger Dep. (Docket # 36, Ex. I) at 64–66.

an already-existing separation agreement.[59]

Second, the extraordinary situation, in which the December 2011 Settlement Agreement and December 2011 Transfer were made, makes the transfer non-ordinary. The transaction was negotiated and consummated because, and at a time when, the Debtor ECD was having serious financial problems, had retained a turnaround specialist, and was actively exploring drastic alternative ways to deal with its financial problems, including a Chapter 11 bankruptcy involving a reorganization or a sale of the business. When ECD's turnaround specialist Mr. Stenger first contacted Defendant to renegotiate his Separation Agreement, Stenger told Defendant that, among other things,

- "the company ... was going through a restructuring,"
- "[i]t looked like we were going to pursue a sale of the company and that may require the company—to facilitate that transaction, a bankruptcy might be filed,"
- "[i]f there isn't a sale transaction, a bankruptcy would likely be filed," and
- "a third alternative was ... just a regular corporate transaction" outside of a bankruptcy case.[60]

And as noted in Part I.A.3 of this opinion, the December 6, 2011 Settlement Agreement itself recited the extraordinary and unusual conditions that led to its making:

> the Company has announced that it has begun discussions with representatives of an informal group of noteholders regarding the Company's re-positioning efforts and to explore the group's interest in restructuring the Company's obligations, and the Company has further announced that, if it is unable to reach an accord with the note-holders, the Company may choose to seek reorganization under the U.S. Bankruptcy Code[.] [61]

Given these undisputed facts and evidence, it is clear that the December 2011 Transfer was, in the words of Mr. Stenger, "unusual," and extraordinary, rather than ordinary, and was neither "made in the ordinary course of business or financial affairs of the debtor and the transferee" nor "made according to ordinary business terms." So Defendant's § 547(c)(2) defense fails as a matter of law.

## V.  Conclusion

For the reasons stated in this opinion, the Court will enter a separate order:

1.  granting summary judgment for Defendant on the entirety of Count 2 of Plaintiff's complaint (the fraudulent transfer count), i.e., with respect to avoidance of both the May 2011 Transfer and the December 2011 Transfer;

2.  granting summary judgment for Defendant on Count 1 of Plaintiff's complaint (the preference count), in part, with respect to avoidance of the May 2011 Transfer;

3.  granting summary judgment for Defendant on Count 3 of Plaintiff's complaint (the count seeking recovery under 11 U.S.C. § 550), in part, with respect to recovery of the May 2011 Transfer, which cannot be avoided;

---

59.  *See* Tr. of Stenger Dep. (Docket # 33, Ex. N) at 41–42.

60.  Tr. of Stenger Dep. (Docket # 36, Ex. I) at 44–47.

61.  Settlement Agreement (Docket # 33, Ex. G) at 1.

4. Denying summary judgment to either party with respect to Count 1 of Plaintiff's complaint, with respect to avoidance of the December 2011 Transfer;

5. In all other respects, denying summary judgment to either party.

In addition, with respect to Count 1 of Plaintiff's complaint, to the extent it seeks avoidance of the December 2011 Transfer under 11 U.S.C. § 547, the Court will order, under Fed. R. Civ.P. 56(g),[62] that the following facts are not in genuine dispute, and will be treated as established in this case: all facts leading to the Court's conclusions, stated in this opinion, that:

A. Plaintiff has proven all the elements for avoidance of the December 2011 Transfer under 11 U.S.C. § 547(b) except the "more than" element under 11 U.S.C. § 547(b)(5) (which will be the subject of trial);

B. As to the "more than" element under 11 U.S.C. § 547(b)(5), Defendant's claim in the hypothetical Chapter 7 case would be $1,415,978, subject to application of the 11 U.S.C. § 502(b)(7) cap; and

C. Defendant has no valid defense to avoidance of the December 2011 Transfer under either 11 U.S.C. § 547(c)(1) or 11 U.S.C. § 547(c)(2).

**62.** Fed. R. Civ. P. 56(g) states:
   **(g) Failing to Grant All the Requested Relief.** If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case.
   (bold in original).